[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-10715

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 6, 2010
JOHN LEY
CLERK

D. C. Docket No. 04-00005-CV-HLM-4

JIMMY LEDFORD,
LARRY O'DELL,
BRYAN WALKER,
DYNAVISION GROUP, LLC,
SIGNATURE LEASING, LLC,

Plaintiffs-Appellants
Cross-Appellees,

versus

SHELBY PEEPLES, JR.,
PFLC, LLC,
INTERNAL MANAGEMENT, INC.,

Defendants-Appellees
Cross-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

(May 6, 2010)

Before TJOFLAT, EDMONDSON and GIBSON,[*] Circuit Judges.

TJOFLAT, Circuit Judge:

ON PETITION FOR REHEARING

In our original disposition of the appeal and cross-appeal in this federal securities fraud case, Ledford v. Peeples, 568 F.3d 1258 (11th Cir. 2009), we affirmed the district court's dismissal of plaintiffs' claims on summary judgment and reversed the court's refusal to grant the defendants sanctions against plaintiffs' attorneys under the Private Securities Litigation Reform Act, directing that sanctions be imposed by the district court on remand. Plaintiffs have petitioned the court for rehearing, contending that we applied the wrong standard in reviewing the district court's sanctions decision and erred in mandating that sanctions be imposed. After considering the plaintiffs' petition for rehearing and the parties' subsequent submissions, we grant the petition in part and deny it in part.

The opinion that follows replicates the original opinion in parts I, II, IV, and V. Part III, which addresses the district court's subject matter jurisdiction, and part VI, which addresses sanctions issues, are modified.

---

[*]Honorable John R. Gibson, United States Circuit Judge for the Eighth Circuit, sitting by designation.

In this case, two parties, X and Y, each owned a fifty percent interest in a limited liability company that manufactured and sold carpets. X provided the financing; Y ran the company and marketed its product. The parties had a buy-sell agreement that enabled either party to buy out the other at any time by offering to purchase the other's interest in the company at an offered price. After receiving an offer, the offeree would have thirty days in which to accept the offer or elect to purchase the offeror's interest at the offered price.

Y offered to purchase X's interest for $3.5 million. X demanded to know whether Y would be borrowing the funds from Z, who earlier had expressed an interest in purchasing the company. Y said that neither Z nor anyone else would be providing the money. X asked Z if it was financing Y; Z said no.

X, unable to operate the factory and market its product without Y or someone with Y's expertise, had to sell and therefore accepted Y's offer. Prior to the date set for the closing, however, X told Y that it would not go forward with the closing unless Y represented that no third party was providing the funds to pay X. Y responded that it had no obligation to disclose the source of its funds and that X was bound by contract to transfer its interest to Y unconditionally. X tacitly agreed by appearing at the closing and transferring its interest to Y.

X subsequently learned that Z had provided the purchase price and,

3

following the closing, had acquired the factory's assets and hired Y to run the business. After discovering Z's involvement, X took Y to court. In a complaint filed in state court, X alleged that Y breached a fiduciary duty to tell it that Z had financed the purchase of its interest, and moreover, that Y's failure to disclose Z's involvement fraudulently induced X to sell its interest to Y.[1] X also brought suit against Z in federal district court, the case now before us, claiming that Z violated federal securities law, state securities law, and state common law by denying involvement in the transaction and causing X to sell its interest to Y.

X lost both cases on summary judgment.[2] Both courts concluded that Y's alleged misrepresentation about Z's involvement in the buy-out did not cause X to sell its interest. Rather, X sold because it was in X's economic self-interest to do so. X needed Y's skills; had X purchased Y's interest, it would have had no one to run the carpet factory or to market its product. X therefore had no economically viable option but to sell.

After the district court granted Z summary judgment, Z moved the court to

---

[1] Invoking the same fiduciary duty and fraudulent inducement theories, X also claimed that Y had wrongfully obtained the parcel of real estate on which the carpet factory was located.

[2] X lost its state case with the exception of a claim against Y involving the real estate referred to supra note 1. That claim is still pending in state court.

4

sanction X and its counsel under the Private Securities Litigation Reform Act ("PSLRA"), Rule 11 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and the court's inherent power on the grounds that X neither produced, nor at any time had available, any evidence to support its allegation that Z's conduct caused it to sell its interest rather than buy Y's interest. The court denied Z's motion.

X appealed the district court's decision rejecting its claims. Z cross-appealed the court's denial of sanctions under the PSLRA. We initially disposed of these appeals in our decision issued on May 22, 2009. See Ledford v. Peeples, 568 F.3d 1258 (11th Cir. 2009). Following X's Petition for Panel Rehearing and Rehearing En Banc,[3] we issue this opinion.[4] On X's appeal, we dismiss part of X's claims for lack of subject matter jurisdiction and affirm the district court's

---

[3] In our original disposition of the appeals, we dismissed some of X's claims for lack of subject matter jurisdiction and affirmed the district court's judgment as to the remainder. We also concluded that Z was entitled to sanctions on a number of X's claims pursuant to Fed. R. Civ. P. 11(b)(2) and (3) and remanded the case for their imposition. In X's Petition for Panel Rehearing and Rehearing En Banc, X claimed error in our disposition of the sanctions. We initially denied this petition, but this opinion withdraws that denial and in effect grants panel rehearing. In the interim, we asked the parties to submit letter briefs on the issues of whether (1) under the PSLRA, the court of appeals, like the district court, has the responsibility to assess whether sanctions are warranted under each of the subparts of Rule 11(b) or is constrained to the parties' definition of the scope of the 11(b) issues on appeal, and (2) sanctions pursuant to 11(b)(2) would be appropriate in this case. This opinion reflects our consideration of the parties' letter briefs.

[4] Aside from the discussion of Z's cross-appeal of the court's denial of sanctions under the PSLRA in part VI, infra, which we revised in light of X's Petition for Panel Rehearing and Rehearing En Banc, this opinion is materially the same as the May 22, 2009, opinion. The section on jurisdiction in part III, infra, has also been modified, but not materially.

judgment as to the remainder. On Z's cross appeal, we conclude that Z is entitled to sanctions on some of X's claims and that the district court needs to make reviewable findings on other of X's claims. This opinion is organized as follows. Part I identifies X, Y, and Z and sets out the events that have given rise to this controversy.[5] Part II canvasses the litigation as it evolved in state court and spread to federal court; describes the state trial and appellate courts' disposition of X's claims against Y and the district court's disposition of X's claims against Z; and, after that, delineates the issues that X's appeal to this court presents. Part III addresses sua sponte whether the district court had jurisdiction to hear some of the federal securities law claims X brought against Z and concludes that it did not. Part IV assesses the merits of X's appeal as to the remaining securities law claims. Part V examines X's claim that Z aided and abetted Y's breaches of fiduciary duty towards X. Part VI explains why the district court should have sanctioned X's counsel for bringing some of X's claims and remands to the district court to make reviewable findings on other of X's claims. Part VII concludes.

I.

---

[5] In doing so, we are mindful that we are reviewing a summary judgment. Thus, the facts we recite in portraying the relevant events are those established by the evidence, taken in the light most favorable to the non-movant, X, and the inferences reasonably drawn therefrom. Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999).

## A.

X is DynaVision Group, LLC ("DynaVision")[6] and its principal owners, Jimmy Ledford, Larry O'Dell, and Bryan Walker.[7] Y is Brenda Smith, Robert Thomas, and Bryan Ownbey. Z is Shelby Peeples.

In July 1998, Paul Walker, Bryan Walker's father, approached Smith, Thomas, and Ownbey, experienced managers in the carpet manufacturing industry in Dalton, Georgia, with the idea of forming a company to manufacture and sell carpets to hotels, motels, restaurants, and others engaged in the hospitality business. Soon thereafter, Smith, Thomas, Ownbey, and Paul Walker formed Signature Hospitality Carpets, LLC ("Signature"), dividing the company's interests equally between DynaVision on one hand and Smith, Thomas, and Ownbey on the other.[8]

---

[6] DynaVision and the other LLCs involved in this case were organized under the Georgia Limited Liability Company Act, O.C.G.A. §§ 14-11-100, et seq.

[7] Ledford, O'Dell, and Walker each owned 29% of DynaVision. Lamar Dixon and Dan Bowen owned the remaining 13% but had no active participation in the events that gave rise to the litigation at hand. Under Georgia law, the ownership rights of the members of a limited liability company are referred to as interests, rather than shares, which indicate ownership rights in a corporation. See O.C.G.A. § 14-11-101 (defining "[l]imited liability company interest" as "a member's share of the profits and losses of a limited liability company and a member's right to receive distributions"); O.C.G.A. § 14-2-140 (defining "shares" as the "units into which the proprietary interests in a corporation are divided").

[8] Smith, Thomas, and Ownbey decided to share equal ownership of their one-half interest in Signature; thus, each owned one sixth of Signature.

7

Under Signature's operating agreement, Smith, Thomas, and Ownbey managed the company, and DynaVision provided the capital.[9] Signature sold carpet to hospitality customers—mainly through contacts that Smith, who was well respected in the industry, had previously established—and arranged for manufacturers in the Dalton area to fill the orders. DynaVision provided the funds that Signature needed to pay the manufacturers by establishing a $200,000 line of credit at a bank near Dalton, the First National Bank of Chatworth ("FNBC").[10]

Signature initially operated out of rented office space; once the company established itself as a going concern, however, its owners decided to find their own manufacturing plant. Anticipating that they would be able to acquire a suitable site in the Dalton area, DynaVision, Smith, Thomas, and Ownbey entered into a new operating agreement (the "Operating Agreement" or "Agreement"), on May 6, 1999. The Agreement referred to Smith, Thomas, Ownbey, and DynaVision as Signature's "Members," and Smith, Thomas, and Ownbey as the "Active

---

[9] The Georgia Limited Liability Company Act defines an "Operating Agreement" as "any agreement, written or oral, as to the conduct of the business and affairs of a limited liability company that is binding upon all of the members." O.C.G.A. § 14-11-101. Signature, DynaVision, Smith, Thomas, and Ownbey entered into the operating agreement under which Smith, Thomas, and Ownbey commenced running the company on July 9, 1998. This initial agreement is not part of the record.

[10] Ledford and O'Dell, who managed DynaVision's affairs, arranged for the line of credit. Paul Walker, who had formed DynaVision, played a limited role in its affairs. He looked after his son Bryan's interest in the company, and frequently spoke for Ledford and O'Dell as well as Bryan.

Members."[11]  It created a six-member Board of Directors, with three directors appointed by DynaVision and three by the Active Members.  The Active Members appointed themselves; DynaVision appointed its accountant, Edward Staten, and left two of its seats vacant.  The Operating Agreement required the Board to unanimously authorize all of Signature's actions.  This meant that DynaVision, through Staten, could have blocked any action the Active Members wanted to take.  The Board rarely met, however, face to face or otherwise, so the Active Members ran Signature's operations without objection.

Under the Agreement, Smith was the company's president and the person in charge of marketing, Thomas was the vice-president of sales, and Ownbey was the vice-president of manufacturing.[12]  A non-solicitation clause provided that if a Member sold his or her interest, that member could not for one year thereafter "call, solicit, or fulfill orders" from "customers or prospects" of Signature.[13]  In

---

[11]  The district court, in its order granting summary judgment, used the term "Active Members" to refer to Smith, Thomas, and Ownbey in the aggregate, and both sides have continued the use of this term in briefing the case to this court.  We adopt this use of this term for the remainder of this opinion.

[12]  Smith, Thomas, and Ownbey worked for Signature in these capacities as full-time employees, terminable at will on the vote of four Board members.  Since the Board had but four members, there was no likelihood that the employment of an Active Member would be terminated unless DynaVision completely filled the three Board positions it controlled.

[13]  The non-solicitation clause appears in Article Ten of the Agreement, "Employment of Active Member; Restrictive Covenant; Non-Solicitation; No Publication of Confidential Information," as § 10.4.  It reads, in pertinent part, as follows:

9

reality, the clause applied only to the Active Members, since they were the ones

who possessed Signature's customer contacts.[14]

The Agreement also contained a buy-sell provision, which is at the center of

the present controversy. This provision is contained in Article Nine of the

Agreement, entitled "Transfer and Assignment of Member Interests." Section 9.5,

"Mandatory Put and Call," reads as follows:

> At any time Dyna-Vision or the Active Members by majority vote
> within that group, may set a price per percentage Interest and give
> written notice of that price to the other group, (the "Notice of Offer to
> Sell or Purchase"). The Members receiving the Notice of Offer to Sell
> or Purchase shall have thirty (30) calendar days to decide whether to
> sell all their Interest at that price or to purchase all the Interest of the
> group giving Notice of Offer to Sell or Purchase at the Price set forth
> in the Notice of Offer to Sell or Purchase. If the Members receiving

---

No Solicitation of Company Employees or Customers. In the event a Member
sells his Interest in the Company, the Member . . . for a period of one (1) year
after the sale of the Interest, shall not . . . call, solicit or fulfill orders from
customers or prospects who have been contacted by the Company within twenty-
four (24) months prior to the sale of the Interest . . . for the purpose of inducing
those customers or prospects to cease doing business with the Company or to
induce those customers to do business with another in competition with the
business of the Company. . . .

On its face, § 10.4 appears to apply to DynaVision as well as the Active Members. In reality, it applied only to the Active Members. DynaVision had no contact with Signature's customers and, if it sold its interest, lacked the know-how to compete with Signature. In this opinion, we therefore treat § 10.4 as applying only to the Active Members.

[14] DynaVision needed the non-solicitation clause to protect its investment. Without the clause, the Active Members, especially Smith, who had most if not all of the customer contacts, could leave the company and immediately compete with Signature, thereby substantially depreciating the value of DynaVision's interest in Signature.

the Notice of Offer to Sell or Purchase fail to make an election . . . , the Members receiving the Notice of Offer to Sell or Purchase shall have to sell their Interest at the price set forth in the Notice of Offer to Sell or Purchase.

Following the execution of the Operating Agreement, the parties located a site for Signature's manufacturing plant and offices on Green Road in Chatsworth, Georgia, a short distance from Dalton. To purchase the site, which included a building that could be converted to accommodate Signature's requirements, the Active Members formed another limited liability company, Signature Leasing, LLC ("Leasing"), with Ledford, O'Dell, and Bryan Walker.[15] On October 19, 1999, Leasing purchased the property ("Green Road Property") with the proceeds of a $630,000 loan from Dalton Whitfield Bank. Bank employee Cynthia Trammel managed the paperwork for the loan.[16] Once the building was equipped to manufacture carpets, Signature moved in.[17]

---

[15] Smith, Thomas, and Ownbey owned 50% of Leasing in equal shares; Ledford, O'Dell, and Walker owned 50%, presumably in equal shares.

[16] According to Trammel on deposition in the state court case, Smith, Thomas, Ownbey, Ledford, and O'Dell, whom the bank considered to be Leasing's principal owners, signed the note and thereby guaranteed Leasing's loan. Bryan Walker owned the same interest in Leasing as Ledford and O'Dell. Why he was not required to sign the note and guarantee the loan is not clear from the record. There is an inference, however, that Paul Walker had a significant relationship with the bank and that the bank, acceding to his wishes, was willing to make the loan without Bryan Walker's participation.

[17] Leasing did not give Signature a formal lease for the property. According to Ledford on deposition in the state court case, Signature paid Leasing each month for use of the property, but he did not indicate the amount of the payments.

Signature then looked to FNBC for working capital. Over a period of several months following its occupancy of the Green Road Property, Signature received several unsecured loans from the bank.[18] In October 2001, Signature asked FNBC for a loan that would pay off its FNBC loans and the balance due on the Dalton Whitfield Bank loan and provide Signature with additional working capital. In total, Signature needed $911,000.

At Signature's request, Trammel, who had moved from Dalton Whitfield Bank to FNBC the year before, handled the transaction. Trammel informed Signature that, subject to the approval of the FNBC's board of directors, the bank would make the loan on the following conditions: Signature would give the bank a deed to secure debt on the Green Road Property and Signature's carpet-manufacturing machines; Smith, Thomas, Ownbey, Ledford, and O'Dell (the "Guarantors") would sign the note and thus guarantee its payment.[19] Signature and the Guarantors agreed to these conditions, the bank's board approved the loan, and

[18] Although the notes Signature gave the bank were neither made part of the record nor published via witness testimony, we infer that they were unsecured. We draw this inference because the bank significantly lowered the interest rate it was charging Signature when it refinanced Signature's debt with a loan secured by a deed to secure debt on the Green Road Property.

[19] Trammel apparently agreed to leave Bryan Walker out of the transaction for the same reason he was not required to sign the note for the $630,000 loan the Dalton Whitfield Bank made to Leasing so it could purchase the Green Road Property. See supra note 16.

12

Trammel proceeded to prepare for the closing.

Trammel's first task was to have FNBC's counsel, Todd McCain,[20] examine the title to the Green Road Property. After examining the title, McCain sent Trammel an opinion indicating that Leasing, not Signature, owned the Green Road Property. Signature therefore could not give the bank a deed to secure the debt with the property unless and until Leasing conveyed the property to Signature.

Trammel overlooked the need for the conveyance, and the loan closed on October 24, 2001 without Leasing having conveyed the property to Signature. Therefore, as part of this transaction, Signature gave FNBC a deed to secure debt for real property it did not own.[21] A month or so later, Trammel happened to read McCain's opinion, noted that Leasing, not Signature, owned the Green Road Property, and realized that Signature's deed to secure the debt was worthless. Something had to be done, so Trammel called McCain.[22] In mid-January 2002, McCain sent Trammel the document needed to solve the problem, a warranty deed

---

[20] McCain was the principal attorney in the McCain Law Firm, located in Dalton.

[21] The note and deed to secure debt were not made part of the record before the district court and thus are not before us.

[22] Trammel spoke to McCain's secretary in his absence. Trammel's testimony on deposition in the state court case is muddled as to precisely what Trammel said to the secretary. What is clear is that, in response to Trammel's call, McCain's office sent Trammel a warranty deed, which would convey the property from Leasing to Signature, for Leasing's execution.

13

conveying the Green Road Property from Leasing to Signature.

Trammel then contacted Smith, informing her that she and the other Guarantors would have to return to the bank and sign a "document" that had been neglected at the closing. The document was the warranty deed, although Trammel did not explain the document's significance to Smith at that time. Trammel asked that Smith pass along this message to the other Guarantors, which Smith did.

Smith, Thomas, and Ownbey promptly went to the bank and signed the document before a notary public, Angela Garland, and in the presence of a witness, Trammel. Smith read the document, which bore the heading "Warranty Deed," and recognized its significance—that Leasing was conveying the Green Road Property to Signature to satisfy one of the conditions on which the bank had made the loan.

Ledford and O'Dell did not appear to sign the document, so Trammel asked Smith to remind them to do so. Smith thereupon called Ledford and asked him to go to the bank and sign what she described as "a document that had been left out of the closing." She did not inform Ledford of the document's legal significance.[23]

---

[23] Ledford, apparently curious about why he needed to sign a document at the bank, called Trammel after his conversation with Smith. Trammel told him that there was some "paperwork" that needed to be signed. She did not inform Ledford of the paperwork's legal significance, and Leford made no further inquiry on this point.

14

Smith also asked Ledford to contact O'Dell and remind him to sign the document. Ledford did so, and, in early February, he and O'Dell separately went to the bank and signed the warranty deed, also before Garland and Trammel. Trammel forwarded the executed warranty deed to the McCain firm, which filed it with the Clerk of the Murray County Superior Court on February 7, 2002.

Ledford and O'Dell insist that they did not know that they were signing a warranty deed; moreover, they claim that they had no understanding of the legal significance of a warranty deed and would not have signed the instrument had they known that it transferred the Green Road Property to Signature.[24]

### B.

In December 2001, Shelby Peeples, a Dalton businessman with interests in the carpet-manufacturing industry, contacted Paul Walker and Ledford and expressed an interest in purchasing Signature. Paul Walker, Ledford, and Peeples had been involved in several business ventures and were on friendly terms.[25] The three men met at least once during December to discuss the possible sale of

---

[24] Both men testified to this effect on deposition in the state court case and in the district court proceeding now under review.

[25] The Peeples and Walker families had strong personal ties. Bryan Walker, on deposition in the state court case, testified that "the Peeples are like family to me, and Shelby's son is my best friend and has been forever."

15

Signature.[26]  At some point, Walker informed the Active Members that Peeples had shown an interest in purchasing Signature.

On January 9, 2002, Paul Walker, Ledford, O'Dell and the Active Members met and agreed to offer Signature and the Green Road Property to Peeples for between $10–12 million.[27]  They designated Paul Walker to represent them in negotiations with Peeples.  Later that day, Paul Walker, Thomas, and Ownbey met with Peeples and some of his associates.  Walker informed Peeples that the Green Road Property was owned by a separate company but offered to sell both Signature and the property for $12 million.  Peeples rejected the offer.  Walker countered with an offer of $10 million.  Peeples rejected that offer as well.  Peeples then asked Walker if he could meet separately with him and, after that, with the Active Members.  Walker said yes but that Peeples could meet with the Active Members only once.  Walker, having made that point clear, met with Peeples to discuss the matter.  Peeples offered him $2 million for DynaVision's interest.  Walker apparently felt insulted, so Peeples increased the offer to $2.5 million.  Walker

---

[26]  In these and subsequent meetings involving the disposition of Signature or the Green Road Property, Paul Walker acted for his son Bryan.  He also appeared to speak for O'Dell in his absence.  See supra note 10.

[27] The $10–12 million figure was based on the Active Members', Walker's, and O'Dell's off-hand evaluation of the worth of the company absent a formal appraisal.  Ledford believed the company was worth more and opposed selling the company.

16

rejected it out of hand, and the discussion ended.

As January wore on, Walker met with Peeples once or twice a week to discuss some business ventures in which they were involved. During some of their meetings, Walker asked Peeples whether he had been negotiating with the Active Members. Peeples said no, but his denial was false. Peeples and the Active Members had been meeting all along to discuss ways that Peeples could acquire DynaVision's interest in Signature without dealing directly with DynaVision. Moreover, with the assistance of his lawyer, Peeples had memorialized the substance of his discussions with the Active Members in a letter, which he faxed to the Active Members on January 21.

The letter mapped out the steps that Peeples and the Active Members would take. First, the Active Members would acquire DynaVision's interest in Signature using the Mandatory Put and Call provision of the Operating Agreement. According to the letter, "on terms and conditions to be set forth in a definitive, legally binding, written agreement, . . . a company owned or controlled by . . . Peeples" would loan $3.5 million to the Active Members "for the purpose of enabling the Active Members to complete the acquisition of the DynaVision Interest." This loan would be made after the Active Members acquired

17

DynaVision's interest.[28]  Next, Peeples would purchase all of Signature's assets

from the Active Members, forgive the $3.5 million loan, and pay the Active

Members $3 million.[29]  The Active Members would remain as managers of

Signature under five-year employment contracts, with annual salaries starting at

$160,000 and increasing each year and possible bonuses based on Signature's

performance.[30]

The letter contained sections entitled "Confidentiality" and "No Discussions

with Others."  The "Confidentiality" section provided, in pertinent part:

> None of the parties hereto will . . . (1) disclose or publicize in any
> manner (except as may be required by applicable law) that discussions
> relating to matters covered [in this letter] or the Loan or the
> Acquisition are taking place between or among the Active Members,
> the Peeples Group, Signature and/or Buyer, or (2) reveal the terms or
> proposed terms of either this Letter or the Loan . . . to any person or
> entity other than representatives [of Peeples who would be conducting
> a due diligence investigation into Signature after the Active Members
> purchased DynaVision's interest].

---

[28]  The loan would be secured by "a first priority security interest in . . . all of the issued and outstanding interests in Signature [and] a security interest in and to all assets of Signature."

[29] The Active Members arrived at the $3 million price for their interest and the $3.5 million price for DynaVision's interest based on their unappraised evaluation of Signature's worth.

[30] The bonus, to be shared equally amongst the Active Members, would "equal . . . twenty percent (20%) of the amount by which the net pre-tax profits of [Signature] exceeded One Million Five Hundred Thousand Dollars ($1,500,000) on an annual basis."  In 2001, Signature paid the Active Members around $130,000 per year.  Under the Operating Agreement, they were eligible for collective bonuses of 20% of all of Signature's yearly profits, if between $500,000–$1,000,000, and 25%, if between $1,000,000–$2,000,000.

The "No Discussion" section stated, again in pertinent part:

> [N]one of the Active Members . . . will, directly or indirectly (i) negotiate or discuss with any other person or entity any transaction involving any business combination involving Signature, or (ii) solicit . . . negotiate . . . or accept any offer, bid or proposal from any other person or entity respecting any transactions involving a sale of assets of Signature (except for sales of property in the ordinary course of business) or any other business combination involving Signature, or (iii) disclose or reveal . . . [information related to Signature's financial condition or methods and plans of operations], other than in the ordinary course of business, to any person or entity not a party to this Letter in connection with the type of transactions described in clauses (i) and (ii) above . . . . In addition, the Active Members will immediately cease and cause to be terminated any previously undertaken or ongoing . . . negotiations with any other person or entity with respect to any transaction of the type described in the preceding clauses (i) and (ii) above.

The letter stated additionally that, "to the extent of any conflict in the provisions of this Letter and the provisions of the Signature Operating Agreement, the provisions of the Signature Operating Agreement shall prevail and the conflicting provision(s) of this Letter shall be void and of no effect whatsoever."

After the Active Members received the letter, they continued their negotiations with Peeples, which, toward the end of January or early February, led to a verbal understanding. As indicated in the January 21 letter, Peeples would loan the Active Members $3.5 million to purchase DynaVision's interests. If the purchase materialized, the Active Members would cause Signature to sell its assets

19

to Peeples.

On February 8, Smith summoned Ledford and O'Dell to discuss tensions between Ledford and O'Dell and the Active Members. Toward the end of this meeting, Smith presented Ledford and O'Dell with the Mandatory Put and Call pursuant to § 9.5 of the Operating Agreement. The Put and Call informed DynaVision that the Active Members would purchase its interest in Signature for $3.5 million unless DynaVision opted to purchase the Active Members' interests for $3.5 million within thirty days. The Put and Call also stated that if DynaVision elected to purchase the Active Members' interests, it would release the Active Members from their obligations under the Operating Agreement's non-solicitation clause. Ledford asked Smith whether Peeples or anyone else would be providing the purchase price. Smith's reply, according to Ledford, was that we "are doing this on our own."[31]

---

[31] Ledford recalled his and O'Dell's reaction to Smith's presentation of the Put and Call in testifying on deposition in the state court case:

HORST [Counsel for the Active Members]: So they [the Active Members] talked to you about these Crescent Extrusions invoices, and then after that discussion, they hand you the February 8th put-and-call letter?
LEDFORD: Well, it was — Larry [O'Dell] and I were sitting at the table, and Brenda [Smith] said something to the effect, "we may as well do this now," or something. I don't know. She was standing at that corner of her desk and she handed the put-and-call to us. I don't know if we had stopped discussing the Crescent invoices. I don't know if we had resolved any — I don't know. I just know that we discussed that and then we got the put-and-call.
HORST: What was your reaction when you got the put-and-call?

20

On February 22, DynaVision's lawyer, H. Greely Joiner, Jr.,[32] wrote a letter to the Active Members stating that because § 9.5 of the Operating Agreement precluded the imposition of conditions on a Put and Call, DynaVision would not honor the Put and Call with the non-solicitation clause condition. The Active Members tacitly agreed. On February 25, they presented DynaVision with a new Put and Call at the same price, $3.5 million, but without the requirement that DynaVision void the non-solicitation clause. Paul Walker and DynaVision treated this Put and Call as valid.

DynaVision's principals were not pleased. They wanted Signature to continue on, under the Active Members' management, because they believed that in time the company would become increasingly profitable. Nonetheless, they

---

LEDFORD: I was shocked.
HORST: Why?
LEDFORD: I thought we had a good partnership.
HORST: What did you say to her when you got it?
LEDFORD: Well, after we read it, I asked if there was anybody else involved or a third party funding it, and she said "No, this is us. We're doing this on our own." I said, "Is there any chance that this could be undone?" And I think Larry [O'Dell] made the comment that "This partnership is over with." . . . .
HORST: What else did Mr. O'Dell say at that meeting other than "This partnership is over with?"
LEDFORD: I don't recall.
HORST: Didn't he say something to the effect that, "Oh, hell, Jim [Ledford], you know who's funding this and he's going to screw us"?
LEDFORD: He could've said something about that. I'm sure we had a real good idea who was funding it. . . .

[32] Joiner is a sole practitioner and owner of H. Greely Joiner, LLC.

21

recognized that they had two options—buy or sell—and thirty days to decide. They did not want to sell because, as the prices ($12 million and $10 million) Paul Walker quoted to Peeples in January indicated, they believed their half-interest in Signature was worth substantially more than $3.5 million. But they did not want to buy either because they lacked the contacts in the hospitality industry necessary to enable them to market Signature's products with any measure of success. Without the Active Members—particularly Smith, with her extensive contacts in the hospitality industry—DynaVision's principals knew they could not operate Signature at a profit.[33] Faced with this dilemma, DynaVision's principals looked

---

[33] Ledford, O'Dell, and Paul Walker all made statements to this effect on deposition in the state court case and, later, in the district court in this case. In his deposition in the state court case, Ledford testified:

> HORST: At any time did you say, "Hey, I'll kick in $1 million or $100,000 or some other amount if we can get some other people to kick in some money to buy out Bob [Thomas], Brenda [Smith] and Bryan [Ownbey]"?
> LEDFORD: We discussed — we discussed that, but the first thing was marketing. If we had marketing, we would have done — if we could have secured people to do the marketing, we would have been interested.
> HORST: So you needed people who could run the business like Bob, Brenda and Bryan had?
> LEDFORD: We needed people that could run the business, yes, sir.
> HORST: Because you within Dynavision didn't have the competency or the skill set to run Signature Hospitality?
> LEDFORD: I didn't have the experience with the customer base, no sir.

In his deposition in the district court case, Ledford testified:

> SINKFIELD [Counsel for Peeples]: . . . it was marketing help that was the key factor in your decision to sell rather than buy. Is that a fair statement?
> LEDFORD: Had we been able to retain Brenda, we would have purchased the company.

SINKFIELD: Is it fair to say that marketing help was the key factor in your decision to sell rather than buy?

LEDFORD: The lack of a marketing group forced us to sell the company.

In his deposition in the state court case, O'Dell testified:

HORST: Now, Dynavision had the money to pay three and a half million dollars to the active members, didn't it?

O'DELL: I could have got the money

HORST: Why didn't you . . . .

O'DELL: Without an operating group, a managing group, that would be most foolish on my part, in my decision or my opinion.

. . .

HORST: So you didn't think that if Dynavision bought out Bob, Brenda, and Bryan, you guys would have the ability to compete with them?

O'DELL: Not without qualified people in that field, no.

HORST: The Dynavision people were not qualified people in that field?

O'DELL: No, they weren't.

In his deposition in the district court case, O'Dell testified:

SINKFIELD: You are running out of time, correct?

O'DELL: Uh-huh.

SINKFIELD: Now, if you bought out the Active Members for 3.5 to give yourself time to complete [a deal with a potential third-party buyer for $8 million], that's what, about a million dollars differential . . . . that you could make just on turning it over . . . did you ever consider doing that?

O'DELL: Well, that would have been a heck of a gamble to take. I mean, you could have, obviously, looked at it that way and thought well, I'll maximize this in another 30 days or 60 days but that would have been a gamble you were taking. I could have been left with a company without any managers, without anyone that knew anything about marketing. No, that was — that — I don't think that was an option we could take. . . .

SINKFIELD: You thought about, but you did not want to take the risk of buying the Active Members' interest on the potential that you could turn it and either make a profit or find somebody who could run it in time to keep it from going under. Is that a fair statement?

O'DELL: Correct.

In his deposition in the state court case, Walker testified:

HORST: Well, if you thought the company was worth more than the put-and-call

for an immediate buyer who would be willing to pay $10 million for the company.

If they could find a buyer willing to pay as much as $8.5 million, they would opt

to buy out the Active Members for $3.5 million. The $5 million they would net

was what they thought their half of Signature was worth.

Ledford and O'Dell contacted three firms, Mohawk Carpets, Clay Miller

---

offer, were you interested in trying to find somebody to lend you the money or for DynaVision to raise the money to buy out the company?
WALKER: We would have had to have found a marketing group to replace the existing marketing group. So its [sic] more than just the money, its [sic] a matter of also finding a group that can continue to grow the company.
HORST: You needed to find a marketing group because Dynavision did not have anybody that was associated with it that had the skill set that Bob, Brenda, and Bryan did; correct
WALKER: That is correct . . . .
HORST: So if you thought the offer that the active members made on February 8th of three and a half million dollars was too low, why didn't Dynavision buy the active members out of Signature Hospitality?
WALKER: I don't think that a marketing group could be found in the short period that they had to look for one.

In his deposition in the district court case, Walker testified:

SINKFIELD: So to your knowledge, one, you did not seek to borrow money, get a core investor, or anyone to assist you in buying out the Active Members Group; is that correct? You didn't personally do that?
WALKER: No.
SINKFIELD: Why not?
WALKER: There is no need to buy out the Active Members without a marketing group. The ability to obtain a marketing group first was necessary, since none of the Active — none of the Dyna-Vision Group were a part of the everyday management or marketing of Signature Hospitality.
SINKFIELD: Is there any other reason they you did not personally seek a financial source to assist you in buying out the Active Members' interest?
WALKER: That would have been the only reason.

24

Carpets, and Matel Carpets, in their search for a buyer. They initially proposed a $10 million price for Signature, eventually lowering the price to $8.5 million as the thirty-day Put and Call period drew to a close. As part of his pitch to sell Signature, Ledford told Jerry Thomas, Matel's owner, that Thomas ought to buy Signature to protect his company from Signature's competition should Signature fall into Peeples's hands.[34] Ledford stressed "the dynamics of what might happen should a . . . company like [Signature] fall into the hands of . . . the Peeples family."[35] But Thomas was not persuaded, nor was anyone else.[36] With time running out, Ledford asked Smith if she would be willing to stay on and run the company if he and the others bought the Active Members' interests. Smith was not interested.

Paul Walker and DynaVision's principals discussed among themselves the possibility that Peeples had financed the Active Members' February 25 Put and

---

[34] Ledford and O'Dell identified the persons they contacted and spoke to at these three firms. The record does not disclose what was said during the conversations with Mohawk and Clay Miller; all that the record reveals is what was said in conversation with Jerry Thomas at Matel. We infer that in making their sales pitches to Mohawk and Clay Miller, Ledford and O'Dell urged them to consider purchasing Signature in order to avoid competition from Peeples.

[35] The quotation is taken from Ledford's testimony on deposition in the state court case.

[36] Thomas considered the possibility of buying Signature if the Active Members remained with the company, so he met with them to explore that possibility. They were not interested, so he abandoned the idea.

Call.  Motivated by these suspicions, Walker confronted Peeples directly.  Peeples denied any involvement.[37]  At one point, Walker warned Peeples that if he was involved, he would not be getting the Green Road Property, because Leasing owned it, not Signature.

C.

On March 27, the thirty-day election period provided by the Put and Call expired.  DynaVision had not exercised its option to purchase the Active Members' interests within the election period; consequently, it had to sell its interest for the $3.5 million Put and Call price.  On March 28, DynaVision and the Active Members began to negotiate the finer terms of the sale.

A few days later, Joiner, presumably representing Ledford, O'Dell, and Bryan Walker as one-half owners of Leasing, asked Smith if he could draw up a lease for the Green Road Property between Leasing, as lessor, and Signature, as lessee.  Smith responded that Signature, not Leasing, owned the property.  Joiner checked the title and discovered the warranty deed from Leasing to Signature that had been recorded on February 7.  Paul Walker and Ledford then demanded that the Active Members consent to a conveyance of the property back to Leasing.  The

---

[37] Paul Walker also had previously suspected that Peeples was behind the Active Members' February 8 Put and Call and confronted him.  Peeples had denied any involvement.

Active Members refused, explaining that it had been everyone's intent to transfer the property to Signature so that Signature could go forward with the FNBC loan transaction; Signature had to have title to the property in order to give the bank a valid deed to secure debt.

Meanwhile, at a meeting of DynaVision's members, the members unanimously adopted resolutions authorizing O'Dell and Ledford to "negotiate, execute and convey the interests of Dyna-Vision in Signature . . . to Smith, Thomas, and Ownbey . . . ." The resolutions went on to allow O'Dell and Ledford to set certain conditions on the conveyance including:

> the repayment of all loans due any [DynaVision] member or any affiliate of any member; the release of all [DynaVision] members from any guarantees issued on behalf of Signature to any financial institution or vendor; the repayment of any and all funds due Dyna-Vision by Signature with respect to any distributions which had not been authorized by the Board of Directors of Signature; and a long-term Lease Agreement between Signature and Leasing, with a minimum term of five (5) years at a rental rate of $11,000 per month plus taxes, insurance, maintenance and repair.

The minutes of this meeting indicate that DynaVision's members knew that the transaction would close on April 30. They provided that because O'Dell, DynaVision's chairman, would be out of town that day, Ledford would act for DynaVision in his place.[38]

[38] The minutes also reflect that Ledford, O'Dell, and Bryan Walker simultaneously held a meeting of Leasing's members to discuss the status of the Green Road Property. Smith,

27

After this meeting adjourned, Ledford and O'Dell met with Joiner and spelled out several conditions the Active Members would have to meet before closing. Joiner informed the Active Members of these conditions in an April 11 letter to their attorney, Douglas Krevolin. One called for the Active Members and DynaVision to execute an agreement Joiner had drafted and enclosed in his letter. The agreement contained the following covenant, presumably designed to smoke out the Active Members' involvement with Peeples:

> [e]ach Assignee [i.e., Active Member] does hereby represent and warrant to the Assignor [i.e., DynaVision] that such Assignee has acquired the Interest from the Assignor for investments solely for said Assignee's own account . . . without any intention of conveying . . . any portion of such Assignee's Interest, and without the financial participation of any other Person in acquiring the Assignee's Interest.

Another condition required the conveyance of the Green Road Property from Signature to Leasing.

Krevolin responded to Joiner's April 11 letter with a letter dated April 16. He informed Joiner that the Active Members would not consent to either of the two conditions. Responding to the threat implicit in Joiner's letter—that DynaVision would not close if the Active Members refused to represent that they were

_____

Thomas, and Ownbey, Leasing's other members, who collectively owned 50% of Leasing, were not present. Although Leasing's Operating Agreement is not part of the record, we assume that the terms of the agreement did not authorize Ledford, O'Dell, and Walker to call a meeting of Leasing's members without notifying Smith, Thomas, and Ownbey.

acquiring DynaVision's interest without the financial participation of a third party—Krevolin said this: "If your client is not willing to proceed with the closing in accordance with the terms of the Operating Agreement, the Active Members may have no alternative but to seek a court order compelling it to close."

Joiner informed Ledford of what Krevolin had written and the position that the Active Members would take if DynaVision refused to close, and Ledford instructed Joiner to proceed with the closing on April 30.

D.

In late April, prior to the closing, the Active Members signed two promissory notes and a collateral agreement. In the collateral agreement, entitled "Collateral Assignment of Membership Interest," they pledged, "as record and beneficial" owner of Signature, all of their ownership interest in Signature as collateral for a loan of $3.5 million from PFLC, LLC and a loan of $855,000 from Internal Management, Inc., both companies owned by Peeples. The proceeds of these loans were to be used, respectively, to pay for DynaVision's interest in Signature and to pay the balance due, $855,000, on the loan FNBC had made to Signature the previous October.

At some point between the April 30 closing and May 7, the Active Members and Peeples signed an Asset Purchase Agreement pursuant to which the Active

Members, as owners of all of Signature, caused the transfer of Signature's assets to Peeples for $5.75 million.[39] Of that amount, $2.25 million went directly to the Active Members, and $3.5 million served to cancel the loan Peeples had made to enable them to buy out DynaVision. The agreement also contained Peeples's promise to indemnify the Active Members for any expenses, including those arising from litigation, they might incur as a result of the transfer of the Green Road Property from Leasing to Signature.

Contemporaneous with the execution of the Asset Purchase Agreement, PFLC, LLC entered into six-year employment contracts with the Active Members, their compensation to consist of $118,000 signing bonuses, initial salaries of $160,000 per year, annual salary increases of $10,000, and bonuses if Signature made over $1.5 million in pre-tax profits in a calendar year.

II.

A.

On November 15, 2002, DynaVision, Ledford, O'Dell, Bryan Walker, and Leasing filed suit for equitable and legal relief against the Active Members and

---

[39] None of the exhibits in the record evidence the disposition the Active Members made, if any, of their interests in Signature after they acquired DynaVision's interest. The testimony taken as a whole, however, creates the inference that at some point following the acquisition, they transferred Signature's assets to PFLC, LLC.

Signature in the Superior Court of Murray County, Georgia. The plaintiffs all retained Joiner as counsel, along with H. Lamar Mixon and David G. H. Brackett, two partners in Bondurant, Mixon and Elmore, LLP. Their complaint[40] was framed in four counts and asserted six claims, all on behalf of the plaintiffs both individually and collectively.[41] Four claims were based on Leasing's conveyance of the Green Road Property to Signature; two involved the transfer of DynaVision's interest in Signature to the Active Members. We begin with the claims regarding the Green Road Property.

The first claim[42] was that Leasing, and Ledford, O'Dell, Smith, Thomas, and Ownbey as owners of interests in Leasing, mistakenly executed the warranty deed conveying the Green Road Property to Signature and thus were entitled to a rescission of that transaction. The second claim[43] was that Smith induced Ledford and O'Dell to execute the warranty deed by falsely representing that FNBC needed

---

[40] DynaVision amended its complaint on December 27, 2002. Our references to the complaint are to the amended complaint.

[41] Although the complaint is not clear on this point, we assume that each plaintiff asserted each of the claims we describe, such that the complaint contained 30 causes of action in all.

[42] We place plaintiffs' claims in an order different from the order in which they appear in the complaint. The first claim appears in Count One.

[43] This claim appeared in Count Two. The complaint implied, if not alleged, that Thomas and Ownbey were vicariously responsible for Smith's conduct, as described in claims two and five. For relief on this and the remaining claims described infra, plaintiffs sought compensatory and punitive damages.

31

a corrective document without warning that the document was in fact a warranty deed. The third claim[44] was that Smith and the Active Members breached their fiduciary duties to Leasing, causing Leasing to lose the value of the Green Road Property, on two occasions—when Smith induced Ledford and O'Dell to sign the warranty deed under false pretenses and when the Active Members refused to cause Signature to return the property to Leasing. The fourth claim[45] was that Signature, Smith, Thomas, and Ownbey were unjustly enriched by the acquisition of the Green Road Property.

The fifth and sixth claims involved the transfer of DynaVision's interest in Signature.[46] The fifth claim,[47] a fraud claim, alleged that upon presenting the conditional Put and Call on February 8, 2002, Smith falsely stated that the Active Members were "doing this on our own," intentionally inducing DynaVision to sell its interest. The sixth claim[48] alleged that by failing to disclose their discussions

---

[44] This claim appeared in Count Four.

[45] This claim appeared in Count Three.

[46] We describe these claims in the text as the Murray County Superior Court and the Georgia Court of Appeals, in Ledford v. Smith, 618 S.E.2d 627 (Ga. Ct. App. 2005), framed the claims in their final dispositions.

[47] This claim appeared in Count Two.

[48] This claim appeared in Count Four.

and final arrangements with Peeples, the Active Members breached fiduciary

duties imposed by the Operating Agreement,[49] the Georgia Limited Liability

[49] Plaintiffs' theory that the Active Members had a fiduciary duty under the Operating Agreement to disclose their final arrangement with Peeples, and that they breached that duty, is based on § 9.2 of Article Nine of the Operating Agreement, entitled "Right of First Refusal," and two of its parts, §§ 9.2.1 and 9.2.3. These two sections state:

> 9.2.1  Notice of Intended Disposition. No Member in the Company may sell less than all their Interest, and in the event a Member receives a bona fide offer from any person in an arms length transaction to purchase all of the Interest which they own in the Company and if the person receiving the offer of purchase desires to sell all the Interest that is the subject of the offer, notice of the desire to sell the Interest shall be given in writing to the other Members and the terms of the offer, which notice shall include the price offered, the name of the offeror, and the payment terms (the "Notice of Intended Disposition").

> 9.2.3  Option to Purchase – Sale by Active Member other than Dyna-Vision. Dyna-Vision shall have the right to purchase all of the . . . Interest[s] to be sold at the same price and under the same terms and conditions as described in the [Active Members'] Notice of Intended Disposition. The election to purchase by Dyna-Vision shall be exercised by giving written notice to [the Active] Members within . . . thirty (30) calendar days after receipt of [the Notice of Intended Disposition].

The Active Members did not consider their discussions with Peeples and his offer to loan them the funds to acquire DynaVision's interest as a "bona fide offer" to purchase their interests in Signature so as to require them to notify DynaVision pursuant to § 9.2.1; hence, they did not notify DynaVision of the discussions. Accordingly, to prevail on their sixth claim based on §§ 9.2.1 and 9.2.3, plaintiffs would have to prove that, prior to March 27 (when DynaVision became obligated to sell its interest), Peeples made the Active Members a bona fide offer to purchase their interests at a set price and on set terms, that they "desire[d] to sell" their interests to Peeples, that § 9.2.1 therefore obligated them to notify DynaVision of the offer, that their failure to notify DynaVision breached that obligation, and that but for the breach, DynaVision would have exercised its right of first refusal and bought the Active Members' interests at the price and on the terms indicated in Peeples's offer. Under this scenario, the Active Members' February 25 Put and Call would become a nullity, replaced by the triggering of § 9.2.3 of the Operating Agreement. That is, DynaVision would have purchased the Active Members' interests pursuant to § 9.2.3 instead of selling its interest pursuant to the § 9.5 Put and Call

33

Company Act,[50] and Georgia common law.

On August 13, 2003, after the parties had joined the issues,[51] plaintiffs moved the state court for leave to amend their complaint to add Peeples and his two companies, PFLC, LLC and Internal Management, Inc., as co-defendants.[52] Plaintiffs represented that they had not learned of Peeples's involvement until the day before, August 12, when they took Ownbey's deposition and Ownbey testified that Peeples had provided the funds to enable the Active Members to trigger the Put and Call.[53]

provision.

[50] The Act imposes a general duty of loyalty on the members and managers of a limited liability company but does not explicitly create a duty to disclose particular facts. O.C.G.A. § 14-11-305 describes this duty as follows:

> In managing the business or affairs of a limited liability company:
> (1) A member or manager shall act in a manner he or she believes in good faith to be in the best interests of the limited liability company and with the care an ordinarily prudent person in a like position would exercise under similar circumstances. A member or manager is not liable to the limited liability company, its members, or its managers for any action taken in managing the business or affairs of the limited liability company if he or she performs the duties of his or her office in compliance with this Code section.

[51] Defendants' answers are not in the record. We infer from what is in the record, and in the Georgia Court of Appeals opinion in Ledford v. Smith, that the Active Members denied the allegations underpinning plaintiffs' several causes of action.

[52] Neither plaintiffs' motion for leave to amend nor the proposed amended complaint are in the record. The record does include, though, the superior court's October 29, 2003 order denying plaintiffs' motion, and that order addresses the argument plaintiffs made in support of the motion.

[53] Defendants deposed Ledford on the same day, August 12.

34

The state court heard oral argument on the motion on September 25, 2003, after discovery had closed.[54] It denied the motion on October 29, 2003, concluding that DynaVision "knew or should have known" at the time it filed its complaint that Peeples was "involved." In its order, the court noted that plaintiffs, in their complaint, had alleged that a third party had been involved in negotiations with the Active Members and DynaVision in early January 2002 over a possible purchase of Signature, but that these negotiations were unsuccessful. Further, they had alleged, "upon information and belief," that a third party had financed the Active Members' acquisition of DynaVision's interest in Signature and, after the Active Members had DynaVison's interest in hand, had purchased Signature's assets. In addition, Ledford had deposed that he knew that Peeples was involved in the January negotiations. It should have been obvious to DynaVision that since Peeples was involved in the January negotiations, he was the party that likely financed the Active Members and purchased Signature. In addition, the court reasoned, adding Peeples as a party at that late stage of the litigation, after discovery had closed, would cause Peeples undue prejudice.

Plaintiffs moved the court to reconsider its ruling. The court denied their

---

[54] Discovery closed on September 7, 2003. The discovery included the taking of the depositions of Peeples, the Active Members, DynaVision's principals, and Paul Walker.

motion on March 8, 2004. In its order, the court was highly critical of plaintiffs'

delay in attempting to join Peeples as a party defendant:

> [As a result of Ledford's deposition testimony] the Court [in its
> October 29 order] concluded that the Plaintiffs knew of the
> involvement of the Peeples Group, at the time the original Complaint
> was filed . . . . The Plaintiffs then waited nine months, until August
> 13, 2003, before filing for leave to amend. The Plaintiffs had
> carefully waited until after the deposition of Shelby Peeples [on June
> 27, 2003] and until after the close of discovery to have their motion
> heard [on September 25, 2003]. In making the October 2003 ruling,
> this Court determined that the Plaintiffs engaged in a deliberate
> scheme to delay joinder without excuse or justification. Therefore,
> the Court finds that the [Plaintiffs'] failure to offer evidence of excuse
> or justification is an independent reason that the Plaintiffs' Motion
> [for Reconsideration] should be denied.

## B.

### 1.

On January 7, 2004, while their motion for reconsideration was pending in

state court, plaintiffs, still represented by Joiner, Mixon, and Brackett, brought the

instant lawsuit against Peeples[55] in the United States District Court for the Northern

---

[55] In addition to Peeples, the plaintiffs sued PFLC, LLC and Internal Management, Inc. We are
unable to discern from the allegations of plaintiffs' complaint the nature of the claims asserted, if
any, against those two entities. We assume they were named as defendants solely for purposes
of declaratory or equitable relief involving the title to the Green Road Property or the status of
DynaVision's former interest in Signature. Because such relief was not forthcoming, and
because plaintiffs do not contend on appeal that the district court erred in denying relief against
PFLC, LLC and Internal Management, Inc., we omit further reference to them.

District of Georgia.[56]  The complaint was framed in 116 paragraphs and seven counts.  Each count incorporated by reference each preceding count, such that Count Seven amalgamated and asserted all of the claims of the preceding counts.

Plaintiffs' complaint is a "shotgun" pleading in that it lumps multiple claims together in one count and, moreover, appears to support a specific, discrete claim with allegations that are immaterial to that claim.  See, e.g., Byrne v. Nezhat, 261 F.3d 1075, 1128-32 (11th Cir. 2001).  When faced with a complaint like the one here, in which the counts incorporate by reference all previous allegations and counts, the district court must cull through the allegations, identify the claims, and, as to each claim identified, select the allegations that appear to be germane to the claim.  This task can be avoided if the defendant moves the court for a more definite statement or if the court, acting on its own initiative, orders a repleader.

In this case, Peeples did not move the court for a more definite statement, nor did the court require one on its own initiative.  Consequently, it is left to this panel to identify in the first instance what plaintiffs were claiming.  We do so by proceeding allegation by allegation and count by count, weeding out and disregarding as extraneous the allegations that have no bearing on a claim.

---

[56]  Plaintiffs invoked the district court's subject matter jurisdiction to entertain their federal securities law claims under 28 U.S.C. § 1331 and 15 U.S.C. § 78aa.

We begin this process with Count One, which alleged three violations of the federal securities laws.[57]  First, after the Put and Call offers of both February 8 and February 25, Peeples denied any involvement in the Active Members' plan to acquire DynaVision's interest, thereby violating § 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b-5(b) promulgated thereunder.[58]

---

[57] Count One incorporated by reference the first eighty-one paragraphs of the complaint.  Those paragraphs alleged, in substance and not in the order we indicate, that (1) on February 8, 2002, Smith falsely told Ledford and O'Dell that the Active Members, in issuing the Put and Call, were "doing this on our own" and that no third party was involved; (2) on several occasions between February 8 and March 27, 2002, Peeples falsely told Paul Walker and/or Ledford that he was not involved in the Active Members' issuance of the Put and Call; (3) the statements made in (1) and (2) above were made with the intent to induce detrimental reliance; (4) plaintiffs did in fact rely on these statements to their economic detriment; (5) Peeples and the Active Members conspired to defraud DynaVision of its interest in Signature by making these statements and by failing to disclose the terms of the January 21 letter and the Asset Purchase Agreement; (6) Peeples is liable for the Active Members' fraudulent conduct because he controlled such conduct within the meaning of 15 U.S.C. § 78t under the terms of the January 21, 2002, letter and the Asset Purchase Agreement; (7) Peeples is liable for the Active Members' fraudulent conduct under the doctrine of respondeat superior; (8) the Active Members breached their obligations to DynaVision under §§ 9.1 and 9.2.1 of the Operating Agreement by not informing plaintiffs that Peeples was funding the February 8 Put and Call and that he had offered to purchase Signature's assets from the Active Members; (9) Peeples is liable for this breach as the Active Members' co-conspirator and/or aider and abettor; (10) the Active Members breached their fiduciary duty to plaintiffs by not revealing that Peeples was providing the funds for their acquisition of DynaVision's interest in Signature and had agreed to purchase Signature's assets following their acquisition; (11) Peeples is liable for this breach under the doctrine of respondeat superior, as a co-conspirator, and as an aider and abettor; (12) the Active Members, acting under Peeples's control and direction or in conspiracy with him, fraudulently induced Ledford and O'Dell to execute the warranty deed by which Leasing conveyed the Green Road Property to Signature; (13) the Active Members, acting under Peeples's control and direction or in conspiracy with him, breached their fiduciary duty to plaintiffs by not informing Ledford and O'Dell that the instrument they signed at FNBC was a warranty deed and of the legal consequences that would adhere to their signing it.

[58] Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), makes it unlawful

[t]o use or employ, in connection with the purchase or sale of any security

38

Second, Peeples "directly or indirectly control[led] the activities of the Active

Members" using the "Confidentiality" and "No Discussions with Others"

provisions of the January 21 letter, the "secret discussions" of January and

February 2002, and the Asset Purchase Agreement.  As such, Peeples was

responsible for the Active Members' conduct in violation of § 10(b) and Rule 10b-

5(b) as a "controlling person" under § 20(a) of the 1934 Act.[59]  Specifically,

registered on a national securities exchange or any security not so registered, or
any securities-based swap agreement (as defined in section 206B of the Gramm-
Leach-Bliley Act [15 U.S.C.S. § 78c note]), any manipulative or deceptive device
or contrivance in contravention of such rules and regulations as the Commission
may prescribe as necessary or appropriate in the public interest or for the
protection of investors.

Rule 10b-5, 17 C.F.R. § 240.10b-5, was promulgated under § 10(b).  Rule 10b-5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means
or instrumentality of interstate commerce, or of the mails or of any facility of any
national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material
fact necessary in order to make the statements made, in the light of the
circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would
operate as a fraud or deceit upon any person, in connection with the purchase or
sale of any security.

"Rule 10b-5 encompasses only conduct already prohibited by § 10(b).  Though the text
of the Securities Exchange Act does not provide for a private cause of action for § 10(b)
violations, the [Supreme] Court has found a right of action implied in the words of the statute
and [Rule 10b-5]."  Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157,
128 S. Ct. 761, 768, 169 L. Ed. 2d 627 (2008) (citations omitted).  In this opinion, we refer to the
§ 10(b) and Rules 10b-5(a) and (b) claims in this case as claims under Rules 10b-5(a) and/or (b).

[59] Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), provides:

Every person who, directly or indirectly, controls any person liable under any

39

Peeples was responsible for Smith's statement that we are "doing this on our own" and the Active Members' breach of their fiduciary duty to DynaVision. Third, Peeples and the Active Members engaged in a "scheme, device, and artifice to defraud" DynaVision, in violation of § 10(b) and Rule 10b-5(a).[60]

In support of their 10b-5(a) claim, plaintiffs, in their opposition to Peeples's motion for summary judgment, identified three components of the "scheme": (1) Peeples and the Active Members agreed not to disclose their negotiations, as evidenced by the January 21 letter; (2) Peeples and the Active Members used the Put and Call provision "to improperly exclude DynaVision from participating in the sale of [Signature] to Peeples"; and (3) Peeples and the Active Members collaborated to "deceive the individual Plaintiffs into signing [the] Warranty Deed."[61]

Finally, the plaintiffs alleged that the misrepresentations, omissions, and

---

provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

[60] See supra note 58.

[61] The complaint, in contrast to what plaintiffs stated in their opposition to Peeples's motion for summary judgment, simply averred that "[t]hrough the activities described above, the Defendants employed a scheme, device, and artifice to defraud that, in fact, operated as a fraud upon DynaVision."

scheme described in Count One caused DynaVision to sell its interests and suffer

injury.[62]  Paragraph 64 of the district court complaint stated:

> Based upon the false and misleading information concerning
> [Signature] and the source of funding for the buy/sell offers, which
> had been provided by the Active Members and Defendants, and in
> reliance on their misrepresentations that there was no offer to
> purchase [Signature] outstanding, DynaVision chose to sell its interest
> in [Signature], rather than purchase the interest of the [Active
> Members].  As a result, in late March 2002, DynaVision became
> contractually required to sell its interest in [Signature] to the Active
> Members pursuant to the terms of the [Signature] Operating
> Agreement.[63]

Counts Two through Five alleged causes of action under Georgia common

law and statutory provisions.[64]  Count Two, "Violation of the Georgia Securities

Act," alleged that the same conduct that gave rise to the Count One claims for

---

[62]  The plaintiffs described the Active Members' misrepresentations made by Smith, the scheme
to defraud, and the manner in which these wrongs caused injury in almost the same way they had
done so in state court.

[63]  Similarly, paragraph 90 of the district court complaint stated: "DynaVision relied on
the [Active Members'] misrepresentations.  DynaVision made its decision to sell under
the put and call based on the false representations that there were no outstanding offers to
purchase [Signature] and, in particular, no offers from a strategic purchaser such as the
Defendants."  Although paragraphs 64 and 90 refer to statements made by the Active
Members, the only conceivably actionable statement in the evidence is Smith's February
8 statement to Ledford and O'Dell that the Active Members were "doing this on our
own."

[64]  These counts, like Counts Six and Seven, incorporated by reference all antecedent allegations
of the complaint. The complaint alleged that the district court had jurisdiction to entertain these
claims under the doctrines of "pendent" and "ancillary" jurisdiction. See infra note 89.

41

relief rendered Peeples liable to plaintiffs under the Georgia securities laws.[65]

Count Three, "Conspiracy to Defraud," alleged that Peeples conspired with the Active Members to (1) fraudulently induce DynaVision to sell its interest in Signature and (2) fraudulently induce Leasing to convey the Green Road Property to Signature. Count Four, "Aiding and Abetting Breach of Fiduciary Duties," alleged that the Active Members, aided and abetted by Peeples, breached the following duties: (1) the fiduciary duty to DynaVision to inform it that Peeples was supporting the February 25 Put and Call, (2) the fiduciary duty to Leasing, and Ledford and O'Dell as Leasing's part owners, to inform them that the document they signed at FNBC was a warranty deed, and (3) the fiduciary duty to Leasing to cause Signature to convey the property back to Leasing. Count Five, "Tortious Interference with Business Relations," alleged that Peeples tortiously interfered with the Active Members' business relations with DynaVision. Count Six, "Attorneys' Fees," sought plaintiffs' expenses, including attorney's fees, incurred in prosecuting Counts One through Five. Count Seven, "Punitive Damages," sought punitive damages as to each of plaintiffs' claims on the ground that

---

[65] Plaintiffs alleged a violation of the Georgia Securities Act, O.C.G.A. § 10-5-12(a)(2) (2005). Section 10-5-12 is "Georgia's equivalent of Rule 10b-5. A plaintiff must prove essentially the same elements under the state provision as he must prove under the federal provision." Pelletier v. Zweifel, 921 F.2d 1465, 1511 (11th Cir. 1991).

42

Peeples's "conduct" "was willful, wanton and . . . would raise a presumption of conscious indifference to consequences."

On March 9, 2004, the day after the state court refused to reconsider its October 29, 2003, order denying plaintiffs' motion for leave to join Peeples as a party defendant, Peeples moved the district court to dismiss plaintiffs' complaint. Alternatively, he requested that the district court stay further proceedings pending the state court's resolution of Ledford v. Smith. He requested a stay because the Active Members had moved the state court for summary judgment, which, if granted, could settle through issue preclusion some of the factual issues involved in plaintiffs' district court claims. The state court heard argument on the summary judgment motions on April 1, 2004. On May 17, 2004, the district court denied Peeples's motion to dismiss and, alternatively, for a stay. On June 6, 2004, Peeples answered plaintiffs' complaint.[66]

---

[66] Peeples's answer responded to each of the complaint's 116 paragraphs, admitting or denying the allegations of the paragraph or stating that the defendant was without knowledge sufficient to form a belief as to the truth of the allegations. The answer also contained twenty-nine "defenses," in three categories: (1) four were affirmative defenses either asserting or implying that the complaint failed to state a claim for relief; (2) six were confession and avoidance defenses; and (3) nineteen constituted general denials. The answer was a shotgun pleading in the sense that many of the defenses in the first two categories failed to identify the claim or claims for relief to which they were responding. This, coupled with the shotgun manner in which plaintiffs chose to frame their complaint, may explain why the district court waited until the case was submitted on motion for summary judgment to attempt to sort out the parties' claims and defenses.

2.

On May 18, 2004, the state court ruled on the pending motions for summary judgment. It granted defendants summary judgment on the fourth and fifth claims and on the sixth claim in part. It denied summary judgment on the first, second and third claims and on the sixth claim in part on the ground that material issues of fact remained to be litigated. Regarding the sixth claim, the court found that the Active Members had a fiduciary duty to inform DynaVision of Peeples's involvement under the Limited Liability Company Act and Georgia common law, but not under the Operating Agreement.

Plaintiffs appealed the court's dismissal of the fifth claim, that the Active Members fraudulently induced DynaVision to part with its interest in Signature. The Active Members cross-appealed the court's disposition of the first claim, that Leasing conveyed the Green Road Property due to mutual mistake; the second claim, that Smith fraudulently induced the transfer of the Green Road Property to Signature by misrepresenting the warranty deed; and part of the sixth claim, that the Active Members breached a fiduciary duty to inform DynaVision of Peeples's participation. Plaintiffs did not appeal the court's disposition of their fourth claim, unjust enrichment through the transfer of the Green Road Property, and the Active Members did not appeal the court's denial of summary judgment on plaintiff's

third claim, that the Active Members had breached a fiduciary duty to Leasing, O'Dell, and Ledford with respect to the transfer of the Green Road Property. While these appeals were pending in the Georgia Court of Appeals, the district court set February 26, 2005 as the discovery deadline.

3.

On July 12, 2005, the Georgia Court of Appeals handed down its decision. Ledford v. Smith, 618 S.E.2d 627 (Ga. Ct. App. 2005). The court affirmed the summary judgment for the Active Members on plaintiffs' fifth claim, reversed the denial of summary judgment on plaintiff's second claim (effectively granting the Active Members judgment on that claim), and reversed part of the sixth claim. After the decision, only the plaintiffs' first claim, which alleged that Leasing conveyed the Green Road Property because of mutual mistake, survived.[67]

The court of appeals explained why it held for the Active Members on all but plaintiffs' first claim. It began with plaintiffs' sixth claim, that the Active Members had a fiduciary duty under the Limited Liability Company Act and common law to disclose their negotiations with Peeples. After observing that

---

[67] As to that aspect of the first claim, the court concluded that unresolved material issues of fact precluded summary judgment.

default fiduciary duties are trumped by an operating agreement,[68] <u>Ledford</u>, 618

S.E.2d at 636,[69] the court explained that Signature's Operating Agreement allowed

the Active Members to obtain Peeples's assistance in funding the Put and Call.

Citing § 7.3 of the Operating Agreement, which authorized the Active Members to

---

[68] O.C.G.A. § 14-11-305(1), which imposes a general duty of loyalty on the managers of a limited liability company, <u>see</u> <u>supra</u> note 50, is subject to modification as follows:

> (4) To the extent that, pursuant to paragraph (1) of this Code section or otherwise at law or in equity, a member or manager has duties (including fiduciary duties) and liabilities relating thereto to a limited liability company or to another member or manager:
>    (A) The member's or <u>manager's duties</u> and liabilities <u>may be</u> expanded, <u>restricted, or eliminated by provisions in</u> . . . <u>a written operating agreement</u>; provided, however, that no such provision shall eliminate or limit the liability of a member or manager:
>       (i) For intentional misconduct or a knowing violation of law; or
>       (ii) For any transaction for which the person received a personal benefit in violation or breach or any provision of a written operating agreement; and
>    (B) <u>The member or manager shall have no liability to the limited liability company or to any other member</u> or manager <u>for his or her good faith reliance on the provisions of a written operating agreement, including, without limitation, provisions thereof that relate to the scope of duties (including fiduciary duties) of</u> members and <u>managers</u>.

O.C.G.A. § 14-11-305(4) (emphasis added).

[69] The <u>Ledford</u> court explained the basis for this policy:

> The contractual flexibility provided in [O.C.G.A. § 14-11-305] is consistent with O.C.G.A. § 14-11-1107(b) of the [Limited Liability Company] Act which provides that: "It is the policy of this state with respect to limited liability companies to give maximum effect to the principle of freedom of contract and to the enforceability of operating agreements."

<u>Ledford</u>, 618 S.E.2d at 636 (quotation omitted).

"engage in all . . . other business ventures . . . but no Active Member shall engage

in businesses similar to the business of the [Signature] by competing with the

business of the Company," the court reasoned that:

> This provision gave the Active Members wide latitude to engage in all other business activities except those "similar to the business of" [Signature], that is, a "competing" carpet company. The provision was broad enough to allow the Active Members to negotiate with Peeples for the purpose of obtaining financing to fund their buy-out of Dyna-Vision's interest in [Signature]. This activity did not "compete" with [Signature]; thus, it did not fall within the exception. Any fiduciary duty of disclosure that the Active Member's [sic] may have owed Dyna-Vision with respect to such a business arrangement was eliminated by the terms of an operating agreement that allowed the business activity which occurred.  See Stoker v. Bellemeade, 272 Ga.App. at 824, 615 S.E.2d 1 (members of an LLC did not breach fiduciary duties by participating in other allegedly competing real estate developments because operating agreement allowed them to do so).

Ledford, 618 S.E.2d at 636.

The court also rejected plaintiffs' argument that the Operating Agreement's

Right of First Refusal provision in § 9.2.1 created a fiduciary duty that required the

Active Members to disclose their intention to sell Signature's assets to Peeples.

The court explained:

> As the superior court correctly concluded, this provision was plainly "intended to prevent outsiders from buying into [Signature]. In this way, the Members maintained control over who their business 'partners' were to be." Because the Active Members' proposed buy-out of Dyna-Vision's interest would not allow a third party to buy into

47

[Signature] and become Dyna-Vision's business partner, the purpose of the right of first refusal was not implicated. Therefore, [Section] 9.2.1 did not require the Active Members to disclose to Dyna-Vision how it intended to finance its buy-out offer.

Id. at 633–34.

Turning to plaintiffs' fifth claim, that the Active Members fraudulently induced DynaVision to sell its interest, the court held that summary judgment was appropriate because the Active Members' failure to inform DynaVision of their deal with Peeples did not cause DynaVision's decision to sell.  Once the Active Members invoked the Operating Agreement's Put and Call provision,  DynaVision, by its principals' own deposition testimony, had no feasible option but to sell its interests.  As the court observed:

> Moreover, both Ledford and O'Dell deposed that, even if they could have raised the money to buy out the Active Members, owning [Signature] without the Active Members would have been "foolish" and "made no sense" because the Active Members were the heart of [Signature's] value.  As O'Dell admitted "we didn't really have a choice . . . .  We didn't have a management group . . . .  The day the put and call came in, I wouldn't give two cents for finding a group to replace them."  Because Peeples' involvement did not affect the value of the Active Members' interest, it was immaterial.  Or, stated differently, [plaintiffs] cannot show that they suffered any damage as a result of their alleged reliance on the Active Members affirmative misrepresentation that Peeples was not involved in the buy-out.

Id. at 634–35.

The court then addressed the plaintiffs' second claim, that Smith, and thus

the Active Members, fraudulently induced Leasing to sign the warranty deed at FNBC by asking Ledford and O'Dell to sign the deed without disclosing the nature of the document. Because it found no evidence of misrepresentation, the court concluded that on this claim, the Active Members were entitled to summary judgment. It held:

> In this case, the evidence shows that FNBC, on its own initiative, drafted the warranty deed and asked all the parties to the loan closing to sign this "corrective paper." Although Ledford and O'Dell contend they signed the document because Smith asked them to do so, the evidence only shows that Smith was relaying the bank's request. There is no evidence in the record that Smith caused the deed to be drafted, acted in concert with the bank, or misrepresented or concealed the document's nature. In fact, it appears from the record that Smith was as ignorant of the document's significance as Ledford and O'Dell. Under these circumstances, we see no evidence of a fraudulent statement or the concealment of a material fact that Smith was under a duty to disclose.

Id. at 636–37.

4.

On July 15, 2005, shortly after the Georgia Court of Appeals's opinion issued, Peeples's counsel sent a letter to plaintiffs' counsel, requesting that plaintiffs dismiss all claims against Peeples. On July 25, plaintiffs' counsel responded, stating that nothing in the court's opinion warranted dismissal and that they had moved the court of appeals for reconsideration. On July 28, 2005, the

49

motion for reconsideration was denied. On August 1, Peeples's counsel again

wrote plaintiffs' counsel, asking that plaintiffs agree to a stay of proceedings in the

district court. Plaintiffs' counsel rejected that request the next day; they planned to

petition the Supreme Court of Georgia for a writ of certiorari.

On September 22, Peeples moved the district court for summary judgment

on all of plaintiffs' claims. In the brief accompanying the motion, Peeples cited the

court of appeals's <u>Ledford</u> decision and stated:

> Should the Georgia Supreme Court deny Plaintiffs' petition for
> certiorari or affirm the Georgia Court of Appeals' order, then
> Plaintiffs' derivative liability claims in the federal action are
> collaterally estopped. In the absence of affirmance or denial, the
> reasoning of the Georgia Court of Appeals, the applicable Georgia law
> as cited, and the conclusions reached on the undisputed facts as
> present in this case are instructive and may be considered by this
> Court.

On October 31, plaintiffs' counsel responded to this statement in their brief

in opposition to Peeples's motion for summary judgment:

> As an initial matter, throughout their brief, the Defendants refer to an
> Opinion of the Georgia Court of Appeals in a state court proceeding
> between the Plaintiffs and the Active Members . . . . The state court
> case has no effect on the central securities fraud claims in this action;
> the opinion is not binding on this Court. Furthermore, a petition for
> certiorari has been filed with the Georgia Supreme Court seeking to
> correct the multitude of legal and factual errors contained in that

50

opinion.[70]

On November 18, the Georgia Supreme Court denied plaintiffs' petition for certiorari review in the state court case. Ten days later, plaintiffs moved the Court to reconsider its decision.[71] The court denied plaintiffs' motion on December 16. The denial operated to make the court of appeals's Ledford decision binding authority on matters of Georgia law. See Lexington Developers, Inc. v. O'Neal Const. Co., Inc., 238 S.E.2d 770, 770–771 (Ga. Ct. App. 1977).

On December 22, the district court, in a comprehensive sixty-eight page order, granted Peeples's motion for summary judgment on all of plaintiffs' claims.[72] Using the doctrine of collateral estoppel, the court disposed of Count Three, that Peeples conspired with the Active Members to defraud DynaVision into selling its interest in Signature,[73] and Count Five, that Peeples tortiously interfered with the Active Members' business relationship with DynaVision. The court

---

[70] Peeples's counsel responded to this position on November 30, adhering to what they had stated in People's September 22 brief and informing the district court that the Georgia Supreme Court had denied certiorari review.

[71] On December 2, the district court ordered counsel to inform it instanter of the supreme court's disposition of the motion.

[72] The court entered a final judgment for Peeples the same day.

[73] The court granted Peeples summary judgment on the Count Three claims that he had conspired with the Active Members fraudulently to induce Leasing to convey the Green Road Property to Signature on the ground that plaintiffs abandoned that claim by failing to support it in their brief in opposition to Peeples's motion for summary judgment.

51

rejected plaintiffs' Count Four claims, that Peeples aided and abetted the Active Members' breach of fiduciary duties, on the ground that Georgia law did not recognize such claims. The court disposed of Counts One and Two, charging Peeples with securities fraud, on the grounds that plaintiffs failed to demonstrate a genuine issue of material fact as to the several elements of those claims.[74]

5.

On January 9, 2006, Peeples moved the district court pursuant to Rule 59(e) of the Federal Rules of Civil Procedure to alter and amend its judgment. He argued that, with respect to plaintiffs' federal securities law claims in Count One, the court had failed to issue the findings required under the PSLRA. The PSLRA requires a district court, upon final adjudication of a federal securities law claim, to "include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion." 15 U.S.C. § 78u-4(c)(1). Peeples urged the court to sanction plaintiffs and their counsel for failing to comply with Rule 11. He also requested

---

[74] Although the district court's December 22 order made no explicit reference to Counts Six and Seven, the court's disposition of Counts One, Two, and Four and its invocation of the doctrine of collateral estoppel to dispose of Counts Three and Five implicitly disposed of those two counts, which sought, respectively, attorney's fees and punitive damages.

52

sanctions for the Count One claims pursuant to 28 U.S.C. § 1927 and the district court's inherent power.[75]

Plaintiffs and their attorneys filed separate responses to Peeples's request for attorney's fees and expenses under the PSLRA. Plaintiffs, represented in the matter of sanctions by new attorneys, claimed that they did not misrepresent the historical facts to counsel, did not advise counsel regarding the law, and were not responsible for the manner in which counsel litigated the case. Relying on our decision in Byrne v. Nezhat, 261 F.3d 1075 (11th Cir. 2001), plaintiffs averred that sanctions against them would not be appropriate. In their separate response, plaintiffs' attorneys asserted, in essence, that a reasonably competent attorney would have recognized that the claims set out in Count One of the complaint were cognizable under the federal securities laws.

On March 21, 2006, the district court granted Peeples's motion to the extent that it sought PSLRA findings, but refused to sanction plaintiffs or their counsel, finding that they had acted in compliance with Rule 11 in pleading and prosecuting their case.

6.

---

[75] Peeples did not move the court to imposes sanctions under Rule 11(b), § 1927, or the court's inherent power with respect to plaintiffs' prosecution of Counts Two through Seven of the complaint.

All five plaintiffs now appeal the district court's disposition of each of their claims. Their brief, however, presents no argument as to Counts Three and Five through Seven. We therefore treat as abandoned their appeal of the district court's disposition of those counts. We also treat as abandoned the appeal of the court's disposition of plaintiffs' claims under two of the federal securities laws. As noted, Count One contained claims under § 20(a) of the 1934 Act and Rules 10b-5(a) and (b). Plaintiffs' brief presents no argument in support of their § 20(a) and Rule 10b-5(a) claims,[76] and, as in the case of Counts Three and Five through Seven, we deem the appeal of the court's disposition of those claims to have been abandoned.[77] Accordingly, what remains are plaintiffs' Count One claims under Rule 10b-5(b); their Count Two claims under the comparable Georgia securities law provision; and part of their Count Four claim, that Peeples aided and abetted the Active Members' breach of their fiduciary duty regarding the handling of the Green Road

---

[76] The district court did not address explicitly DynaVision's Count One Rule 10b-5(a) claim, and plaintiffs' initial brief in this appeal contains no argument in support of the Rule 10b-5(a) claim qua claim. Instead, the brief refers to a "scheme," which forms the basis of a Rule 10b-5(a) claim, in arguing that there was a genuine issue of material fact as to the "reliance" element of Count One's Rule 10b-5(b) claim. We therefore treat Count One's Rule 10b-5(a) claim as having been abandoned.

[77] We likewise deem abandoned plaintiffs' Count Two state law claims that mirror the § 20(a) and Rule 10b-5(a) claims. See O.C.G.A. § 10-5-12(a)(2)(A)–(C).

54

Property.[78]  Peeples cross-appeals the district court's refusal to sanction plaintiffs and their counsel as required by the PSLRA for prosecuting Count One of the complaint.

Our review proceeds as follows.  We first consider our subject matter jurisdiction over plaintiffs' Count One 10b-5(b) claims.[79]  Next, we move to plaintiffs' Count Four aiding and abetting claims.  After that, we take up the PSLRA sanctions issues.

## III.

Our first task is to consider whether the district court had subject matter jurisdiction to entertain the Count One claims—specifically, the Rule 10b-5(b) claims that remain—under 28 U.S.C. § 1331[80] and 15 U.S.C. § 78aa.[81]  See

---

[78]  Plaintiffs did not brief, and therefore abandoned, the issue of whether the district court erred in dismissing the claim that Peeples aided and abetted the Active Members' breach of a fiduciary duty to inform DynaVision's principals that he was providing the $3.5 million the Active Members needed to close the purchase of DynaVision's interest.

[79] What we say about the merits of the Count One claims applies to the Count Two claims.  See GCA Strategic Inv. Fund, Ltd. v. Joseph Charles & Assocs., Inc., 537 S.E.2d 677, 682 (Ga. Ct. App. 2000) ("To evaluate a claim of securities fraud under OCGA § 10-5-12(a), we look to the similar elements a plaintiff must allege under section 10(b) of the Securities Act of 1934. . . .").

[80]  Section 1331 states: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

[81]  Section 78aa states, in pertinent part:

55

Hernandez v. U.S. Attorney Gen., 513 F.3d 1336, 1339 (11th Cir. 2008) ("[W]e must inquire into subject matter jurisdiction sua sponte whenever it may be lacking."). Those claims were brought by DynaVision and four other plaintiffs: Leasing, Jimmy Ledford, Larry O'Dell, and Bryan Walker (the "co-plaintiffs"). The question here is whether the court had jurisdiction to litigate the Count One claims of all five plaintiffs. We find the answer to the question in Supreme Court precedent.

Under Blue Chip Stamps v. Manor Drug Stores, a plaintiff must be a purchaser or seller of a security to have a private cause of action under Rule 10b-5. 421 U.S. 723, 730–31, 95 S. Ct. 1917, 1922–23, 44 L. Ed. 2d 539 (1975).[82] According to the allegations of the complaint and the relevant deposition

---

The district courts . . . shall have exclusive jurisdiction of violations of [the Securities and Exchange Act of 1934] or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder.

[82] See also Smith v. Ayres, 845 F.2d 1360, 1364 (5th Cir. 1988) (noting that the district court could have alternatively dismissed plaintiff's individual securities-fraud claim because he "did not buy or sell anything"; the "fact that he was a stockholder in a corporation that may have bought or sold [was] not sufficient to give him standing in an individual capacity"); Rathborne v. Rathborne, 683 F.2d 914, 919 & n.16 (5th Cir. 1982) (holding that only a corporation had standing to bring a direct 10b-5 action; the "shareholder-plaintiff [did] not" because he was "not a party to the transaction and therefore was not an actual purchaser or seller of securities").

testimony, there was but one seller, DynaVision. It sold one security, its fifty-percent interest in Signature. DynaVision, as the seller of a security, therefore had standing to sue Peeples under Rule 10b-5(b). Co-plaintiffs did not.[83]

The district court should have recognized this at the time it considered and ruled on Peeples's motion to dismiss the complaint.[84] If not then, it should have recognized co-plaintiffs' lack of standing when it took Peeples's motion for summary judgment under advisement. After concluding that co-plaintiffs failed to satisfy Blue Chip Stamps' requirement, the court should have moved to the question of whether to dismiss their claims for want of subject matter jurisdiction

---

[83] Ledford, O'Dell, and Walker alleged, albeit by implication, that the loss DynaVision sustained as a result of Peeples's securities fraud violations was passed on to them through their ownership interests in DynaVision, in that the loss diminished the value of their interests. In other words, they were like the shareholders of a corporation that sold securities it owned in reliance on a third party misrepresentation made in violation Rule 10b-5(b) and who, as a result, incurred a loss. Under Blue Chip Stamps, however, such derivative injury to shareholders is not directly compensable under Rule 10b-5. 421 U.S. at 737-38, 95 S. Ct. at 1926.

[84] See Fed. R. Civ. P. 12(b)(6). Peeples's motion was addressed to plaintiffs' entire complaint and assumed that all of the plaintiffs were prosecuting Count One. As for the Count One claims, the memorandum of law accompanying the motion argued that DynaVision's sale of its interest to the Active Members was not a "securities transaction" and, therefore, Peeples's alleged misrepresentations were not made "in connection with" the purchase or sale of a security as required by Rule 10b-5(b). The memorandum did not argue that co-plaintiffs were barred from suing under Rule 10b-5(b) because they were not sellers of a security; nor did the memorandum argue that because co-plaintiffs were not sellers, the court should have dismissed them from Count One pursuant to Fed. R. Civ. P. 12(b)(1).

57

under Rule 12(b)(1) of the Federal Rules of Civil Procedure.[85]  Federal jurisdiction

may be defeated when the alleged federal claim "'clearly appears to be immaterial

and made solely for the purpose of obtaining jurisdiction or where such a claim is

wholly insubstantial and frivolous.'"  Steel Co. v. Citizens for a Better Env't, 523

U.S. 83, 89, 118 S. Ct. 1003, 1010, 140 L. Ed. 2d 210 (1998) (quoting Bell v.

Hood 327 U.S. at 682–83, 66 S. Ct. at 776) (emphasis added).[86]  The word "may"

implies that the dismissal of a claim for want of jurisdiction is committed to the

sound discretion of the district court.  But, just as in any instance where the district

court has discretion, that discretion can be abused.  Here, co-plaintiffs' federal

securities fraud claims were plainly and indisputably frivolous.  They were, in the

Supreme Court's words, "so patently without merit as to justify . . . the court's

dismissal for want of jurisdiction."  Bell, 327 U.S. at 683, 66 S. Ct. at 776.

Co-plaintiffs' inability to invoke the district court's jurisdiction under 28

---

[85]  The defense of lack of subject matter jurisdiction is never waived.  "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3).  Prior to considering the question of whether to dismiss the claims for want of jurisdiction, the court had to "assume jurisdiction to decide whether the allegations state a cause of action on which the court [could] grant relief."  Bell v. Hood, 327 U.S. 678, 682, 66 S. Ct. 773, 776, 90 L. Ed. 939 (1946).  The district court did so here.  Its determination that co-plaintiffs had stated a case for Rule 10b-5 relief eliminated the necessity of considering whether jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 78aa was lacking.

[86]  This principle originated in Bell v. Hood and we therefore associate it with that case throughout this opinion.

U.S.C. § 1331 and 15 U.S.C. § 78aa for Count One, however, did not foreclose their right to litigate the claims asserted in Counts Two through Seven. Despite the fact that Counts Two through Seven did not implicate a federal question, these counts were joined in the case by a series of jurisdictional steps.[87] First, because DynaVision sold a security, the district court had subject matter jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 78aa to adjudicate DynaVision's Count One securities fraud claim. Second, since the court had "original jurisdiction" under those two statutes, it had supplemental jurisdiction under 28 U.S.C. § 1367[88] to adjudicate any other claims DynaVision had against Peeples that were "so related

---

[87] The steps laid out below were not taken as a matter of record by plaintiffs' counsel, nor do they appear to have been recognized by Peeples' counsel or the district court. As far as counsel for the parties and the court were concerned, no jurisdictional or procedural obstacles precluded the court from entertaining on the merits all of the claims co-plaintiffs and DynaVision presented.

[88] Section 1367(a) states, in pertinent part:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

Each count in the complaint incorporated all of the prior counts' allegations and claims; for example, Count Seven included the claims of Counts One through Count Six. See supra part II.B.1. The Count One claims were not culled out of Counts Two through Seven by the court on its own initiative or via a motion by Peeples for a more definite statement. Our discussion in the text proceeds under the assumption that the district court struck from each count all of the prior claims incorporated by reference.

59

to" the Count One claims that they formed part of "the same case or controversy." Id.[89] DynaVision's claims in Counts Two through Seven, given the manner in which the complaint presented them,[90] appear to have been so related to DynaVision's Count One allegations that they arguably formed part of the same case or controversy described in Count One.[91] Finally, Rule 20 of the Federal Rules of Civil Procedure may have authorized co-plaintiffs to join DynaVision as plaintiffs in Counts Two through Seven on the theory that their claims arose out of "the same transaction, occurrence, or series of transactions or occurrences"

---

[89] As stated in note 64, supra, plaintiffs founded the district court's subject matter jurisdiction over their non-federal claims on pendent claim jurisdiction and ancillary jurisdiction. The complaint contained no reference to 28 U.S.C. § 1367, which had superceded pendent claim jurisdiction and ancillary jurisdiction. See Palmer v. Hosp. Auth. of Randolph County, 22 F.3d 1559, 1563 n.3 (11th Cir. 1994) ("Formerly known as pendent and ancillary jurisdiction, such grounds for the exercise of federal subject matter jurisdiction have now been codified in 28 U.S.C. § 1367."). Notwithstanding the lack of a reference to § 1367, that section did provide the district court with jurisdiction to entertain most of plaintiffs' state law claims. We therefore proceed accordingly.

[90] See supra part II.B.1.

[91] As indicated supra part II.B.1, both DynaVision and Leasing brought "Conspiracy to Defraud" claims in Count Three. The Leasing claim, relating to the Green Road Property, appears to fall outside the court's § 1367 supplemental jurisdiction because it is not "so related" to the claims over which the court has original jurisdiction that it "form[s] part of the same case or controversy." Count Four also contained two "Aiding and Abetting" claims, one brought by DynaVision and the other by Leasing, Ledford, and O'Dell. The Leasing, Ledford, and O'Dell claim, like Leasing's Count Three claim, appears to fall outside the court's § 1367 jurisdiction. Peeples did not object to the court's entertainment of these non-supplemental jurisdiction claims. Due to this and the shotgun nature of the complaint's allegations, we decline to explore the matter further.

60

forming the predicate for DynaVision's claims.[92]  Except as to Count One,

therefore, we have jurisdiction to consider co-plaintiffs' claims.[93]

IV.

With jurisdiction established, we now turn to plaintiffs' remaining securities

fraud and aiding and abetting claims.  We address these claims in sequence,

affirming the district court's grant of summary judgment for Peeples.

A.

In a typical § 10(b) civil action for a violation of Rule 10b-5(b), a plaintiff

must prove (1) a material misrepresentation or omission by the defendant, (2)

scienter, (3) a connection between the misrepresentation or omission and the

purchase or sale of a security, (4) reliance upon the misrepresentation or omission,

(5) economic loss, and (6) loss causation.   Stoneridge Inv. Partners, LLC v.

---

[92]  Rule 20, as it existed at the time plaintiffs filed their complaint, stated, in pertinent part:

> (a) Permissive Joinder.  All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action.

[93]  The Georgia securities law cases have adopted Blue Chip Stamps's holding that only a buyer or seller of a security has standing to sue under Georgia's version of Rule 10b-5.  See Mack v. Smith, 344 S.E.2d 474, 475 (Ga. Ct. App. 1986); cf. Bell v. Sasser, 520 S.E.2d 287, 292 (Ga. Ct. App. 1999).  Co-plaintiffs' Count Two claims fail under Fed. R. Civ. P. 12(b)(6) because co-plaintiffs were not involved in the sale of a security.

Scientific-Atlanta, 552 U.S. 148, 157, 128 S. Ct. 761, 768, 169 L. Ed. 2d 627 (2008).[94]

To establish a genuine issue of material fact as to the reliance element,[95] plaintiffs[96] had to present evidence that, in conversations with Paul Walker, Peeples stated that he was not involved in the Active Members' attempt to acquire DynaVision's interest in Signature, that his statements were false, that

---

[94]   The literal definition of a security under the 1934 Securities and Exchange Act, as codified in 15 U.S.C. §78c(a)(10), does not include an interest in a limited liability company. See Nelson v. Stahl, 173 F. Supp. 2d 153, 164 (S.D.N.Y. 2001) ("The Exchange Act's definition of security does not refer to membership interests in limited liability companies."). Nonetheless, plaintiffs asserted in their complaint and in briefing to the district court that DynaVision's interest in Signature was a security. Peeples did not question this assertion, nor did the district court analyze this issue on its own initiative.

Our independent research of this issue indicates that whether DynaVision's interest could be considered a security is problematic. We are satisfied, however, that plaintiffs' allegation that DynaVision's interest was a security passes the threshold test set forth in Bell v. Hood. See Williamson v. Tucker, 645 F.2d 404, 416 (5th Cir. May 1981) (holding that the plaintiff's allegation that joint venture interests were securities was not so obviously frivolous as to fail the low jurisdictional bar in Bell v. Hood). In the absence of any briefing on this issue by the parties and in light of our resolution of plaintiffs' Rule 10b-5(b) claims in favor of Peeples, we see no need to decide whether DynaVision's interest was a security.

[95] The district court used the term "transaction causation" in referring to the reliance element. That terminology is irrelevant, as "[t]ransaction causation" is no more than "another way of describing reliance." Robbins v. Koger Props., Inc., 116 F.3d 1441, 1447 (11th Cir. 1997); see also Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341–342, 125 S. Ct. 1627, 1631 (2005) (explaining that reliance is one of the elements of a Rule 10b-5(b) claim and is "often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation'").

[96]   We refer to all five plaintiffs. Our Bell v. Hood jurisdictional ruling that struck co-plaintiffs' claims from Count One had no effect on the district court's jurisdiction to entertain the Count Two claims under the Georgia Securities Act.

62

DynaVision's principals reasonably relied on the statements,[97] and that because of that reliance, the principals caused DynaVision "to engage in the transaction in question." Robbins v. Koger Props., Inc., 116 F.3d 1441, 1447 (11th Cir. 1997) (quotation omitted). Put another way, plaintiffs had to demonstrate that but for Peeples's statements, DynaVision would not have sold its interest but, instead, would have bought the Active Members' interests. Huddleston v. Herman & MacLean, 640 F.2d 534, 549 (5th Cir. Mar. 1981), rev'd on other grounds, 459 U.S. 375, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983) ("Reliance is a causa sine qua non, a type of 'but for' requirement: had the investor known the truth he would not have acted.").

After carefully considering the evidence before it, the district court concluded that no genuine issue of material fact existed as to this element: Peeples's denial of any involvement in the Active Members' plan did not cause DynaVision to sell its interest. The court explained:

> The evidence in the record, viewed in the light most favorable to
> Plaintiffs, shows that Plaintiffs themselves did not have the necessary

---

[97] In an action for damages under Rule 10b-5(b) based on the defendant's misrepresentation, the plaintiff must show that he "reasonably relied on and was injured by the misstatement." Pelletier v. Zweifel, 921 F. 2d 1465, 1510 (11th Cir. 1991). In the Rule 10b-5(b) context, we have used the words "justifiably relied" as the equivalent of "reasonably relied." E.g., Bruschi v. Brown, 876 F.2d 1526, 1528 (11th Cir. 1989). Thus, "reasonably" and "justifiably," for Rule 10b-5(b) purposes, express the same element.

experience, marketing skills, and expertise to run [Signature] in the absence of the Active Members, and that Plaintiffs' attempts to obtain a management group and necessary personnel to work with [Signature] were unsuccessful. Plaintiffs themselves testified that it would be foolish or risky to purchase the Active Members' interests in [Signature] without having a management group or marketing group in place to replace the Active Members. Although Plaintiffs summarily contend that they would have acted differently if they had known of Defendant Peeples' involvement, that summary and conclusory contention is not sufficient to allow Plaintiffs to avoid summary judgment. Indeed, knowledge of Defendant Peeples's involvement would not have changed the fact that Plaintiffs did not have the necessary experience, marketing skills, and expertise to run [Signature], and that Plaintiffs' attempts to obtain a management group and necessary personnel to work with [Signature] were unsuccessful. The failure to disclose Defendant Peeples' involvement thus did not cause Plaintiffs' decision to sell Plaintiff DynaVision's interest under the February 25, 2002, Put and Call . . . .[98]

## B.

To obtain a reversal of the district court's resolution of the reliance issue,

---

[98] This is essentially verbatim what the Georgia Court of Appeals said in Ledford, that DynaVision would have sold its interest notwithstanding Peeples's involvement. Ledford, 618 S.E.2d at 634–35; see also supra part II.B.2. The court of appeals, after considering the evidence in the light most favorable to plaintiffs, inferred this ultimate fact because the evidence pointed to the fact as a matter of law. The question for the district court was whether it should invoke the doctrine of collateral estoppel and conclusively rely on the court of appeals' statement of ultimate fact in determining whether, in resolving plaintiffs' Rule 10b-5(b) claim (and the comparable Georgia securities law claim), DynaVision's principals would have sold DynaVision's interest notwithstanding Peeples's denial of involvement. The district court invoked the doctrine in deciding plaintiffs' claims in Counts Three and Five, but not in deciding any of the factual issues involved in plaintiffs' federal and state securities laws claims. We decline to consider the doctrine's application to those claims as a matter of efficiency since the parties have not briefed the issue.

plaintiffs must satisfy us that the evidence in the record creates a jury issue as to whether DynaVision would have purchased the Active Members' interests, rather than sell its interest, had Peeples told Paul Walker and Ledford that he was providing the Active Members the $3.5 million they needed to close the transaction. There is no direct evidence that DynaVision would have elected to buy the Active Members' interests had Peeples admitted that he was providing the money. Because there is no direct evidence that DynaVision would have elected to buy, we ask whether such election can be inferred from the record. Specifically, we ask whether it can be inferred as an ultimate fact from the subsidiary, circumstantial facts shown by the evidence, viewed in the light most favorable to plaintiffs.

Plaintiffs argue that circumstantial facts sufficient to create the inference are present. Peeples argues that they are not, that the circumstantial facts create the contrary inference: DynaVision sold because doing so was in the economic self-interest of its principals, and it would not have elected to buy even if it had known of Peeples's involvement.

In assessing these opposing positions, our first task is to identify the circumstantial facts that the evidence establishes as a matter of law. Once that is done, we determine whether it would have been permissible for a jury to draw the

65

inference that DynaVision would have elected to purchase the Active Members's interests had it known that Peeples was providing the $3.5 million that enabled the Active Members to close.

The evidence discloses three sets of circumstantial facts, with inferences flowing from each set. We summarize each set in the headings of the following subparts and conclude that, as a matter of law, DynaVision's principals would have sold even if they had known about Peeples's involvement.

1.

DynaVision lacked the expertise necessary to operate Signature's factory and market Signature's product. Consequently, if the Active Members left, there would be no one to run the company, and Signature's value would rapidly decline.

There is no dispute regarding the roles that DynaVision's principals and the Active Members performed for Signature. The principals functioned as Signature's financiers. By establishing the $200,000 line of credit, they were able to provide Signature with the funds required to start the business and pay the bills until carpet sales generated enough income to cover the company's operating expenses. The Active Members were the managers of the enterprise. Ownbey and Thomas handled the manufacturing and sales. Smith, the company's president, was in charge of marketing, since she was well and favorably known in the

66

hospitality industry and thus capable of attracting a considerable volume of business.

By their own admission in depositions taken in the state court case and in this case,[99] DynaVision's principals could not, themselves, replace the Active Members, most notably Smith, for the principals had no experience in manufacturing carpet and were virtually incapable of marketing Signature's products. Ledford testified that the principals had no "experience with [the] customer base" and therefore could not run the company. He emphasized Smith's key role in marketing Signature's products, stating that "had we been able to retain Brenda, we would have purchased the company."[100] Paul Walker said that "none of the DynaVision Group were a part of the everyday management or marketing of Signature" and that this "was [the] only reason" why DynaVision did not elect to purchase the Active Members' interest after the Put and Call issued. O'Dell admitted that DynaVision's principals were not qualified to run the company.

[99] This testimony appears in the question and answer format appearing in note 33 supra.

[100] The expert opinion testimony DynaVision proffered to the district court concerning Signature's value buttressed the fact that Signature's value was tied to the Active Members' management, marketing skills, and good will. DynaVision's expert, in estimating that Signature was worth $14 million, assumed not only that the Active Members would remain with the company but also that Smith would increase her ownership interest in Signature to the point that the firm would qualify as minority owned, and therefore receive additional revenue—presumably from sales set aside for minority-owned entities. The expert provided no estimation as to Signature's value without the Active Members' presence.

In addition to this testimony, DynaVision's principals' conduct towards the Active Members spoke volumes about how important the principals felt it was to keep the Active Members in the company, at least until the principals themselves decided to sell.[101] The principals included in the Operating Agreement a provision that made it highly unlikely that the Active Members would leave Signature before the principals were ready to sell. If an Active Member sold his or her interest in the company, § 10.4 of the Agreement would preclude that Member from competing with Signature for a period of one year.[102] Because they were not financially independent, the Active Members would presumably need to find other employment in the carpet business upon leaving the company. Lying idle for a year would be burdensome, and an Active Member would therefore think twice before leaving Signature.

The principals also included a provision to make it hard for the Active

---

[101] Under the "Right of First Refusal" provision of the Operating Agreement, if DynaVision's principals obtained a bona fide offer to sell DynaVision's interest in Signature, and they desired to sell the interest, they would have to notify the Active Members who, in turn, would have the right to purchase DynaVision's interest at the price set in the bona fide offer. See supra note 49. Oddly enough, this right of first refusal would not be triggered if DynaVision's principals received a bona fide offer to sell their interests in DynaVision and decided to accept it. In other words, DynaVision's principals could sell their interests in Signature in two ways: (1) causing DynaVision to sell its interest in Signature, which would trigger the Active Members' Right of First Refusal; or (2) selling their interests in DynaVision, which would not.

[102] See supra note 13.

Members to buy out DynaVision before DynaVision was ready to sell. Section 9.1 of the Operating Agreement addressed the possibility that the Active Members might attempt to buy DynaVision's interest pursuant to the § 9.5 Put and Call provision. DynaVision's principals knew the Active Members lacked the personal resources sufficient to make an offer that DynaVision' principals would be tempted to accept;[103] consequently, the Active Members would have to borrow the money to fund any buy-out.[104] Obtaining a conventional loan from a bank or other lending

---

[103] In Ledford's state court deposition, he testified as follows:

HORST: Did it make any difference to you whether there was a third party involved in funding Bob, Brenda, and Bryan's offer to purchase Dynavision . . . .
LEDFORD: Yes, it would make a difference to me.
HORST: Why?
LEDFORD: Because if Bob, Brenda, and Bryan didn't have financial backing from them, I don't think they could have bought our interest and I don't think this whole thing would have come up.

[104] In Ledford's district court deposition, he testified as follows:

SINKFIELD: Do you know whether collectively and without help from a third person in some form or the other they had the resources to pay three-and-a-half million dollars for the Dyna-Vision interest?
LEDFORD: No, sir, I don't know.
SINKFIELD: You don't know one way or the other . . . . Did you have any opinion on the subject at the time?
LEDFORD: At the time we received the Put and Call . . . I had an opinion, yes, sir.
SINKFIELD: And what was that opinion?
LEDFORD: That they probably could not.
SINKFIELD: And based on that opinion, how did you think they would pay for the Dyna-Vision interest if y'all decided not to buy them out?
LEDFORD: I didn't know.
SINKFIELD: Did you have an opinion as to what they would have to do?

69

institution would require collateral, and the only collateral they had of significant value was their individual interests in Signature.  Section 9.1, however, barred the Active Members from pledging their interests to a lending institution.[105]  As a

LEDFORD: Well, I assumed if they bought us out . . . they would . . . have to borrow the money.  If they couldn't do that, they would have to get the money from someone else.

In Walker's district court deposition, he testified as follows:

SINKFIELD: So you knew [the Active Members] had to have funding from [an outside] source, is that correct?
WALKER: If they closed the deal, yes.
SINKFIELD: And you knew, to the best of your knowledge, that they did not have sufficient resources among themselves to do it without outside funding; is that correct?
WALKER: I would say with suspicion, they didn't have.  But to my initial knowledge, no.
SINKFIELD: But to the best information you had told you they couldn't fund it without outside help.  Is that correct?
WALKER: To the best information I had, yes.

[105]  Section 9.1 of Article 9 of the Operating Agreement, "Restrictions on Transfers and Encumbrances," states, in pertinent part:

The Members have . . . agreed that, without the express written consent of the Company and all other Members in the Company, they will not transfer, assign, sell, pledge, encumber, hypothecate . . . any of their Interests . . . except strictly in accordance with the terms and requirements of the this Agreement, the same being exhaustive of all methods and means by which such [Interests] may be transferred.  Any purported transfer in violation of any provision herein shall be void and of no effect, and shall not operate to transfer any title or interest to the purported transferee.

Like the Right of First Refusal Provision, supra note 49, this restriction had an uneven effect. Although the Active Members would have to obtain DynaVision's consent in order to pledge their interests in Signature as collateral for a loan, DynaVision's principals, namely Ledford, O'Dell, and Walker, would not have to obtain the Active Members' consent in order to pledge their interests in DynaVision—and, indirectly, their interests in Signature—as collateral for a loan.  The Active Members' consent would be necessary only if DynaVision itself wanted to pledge its interest in Signature as collateral for a loan it was obtaining.

practical matter, then, the only way the Active Members could attempt a buy-out of DynaVision's interest would be to find someone like Peeples—someone willing to advance the purchase price on the condition that, after acquiring DynaVision's interest, the Active Members would sell him all or part of the business and agree to stay on and run the company.

Joiner revealed how indispensable the Active Members were to Signature's value in the letter he wrote to Krevolin on April 11, 2002, nineteen days before the closing was to take place. In the letter, Joiner informed Krevolin that DynaVision would refuse to close unless the Active Members signed a new agreement with DynaVision and, as required by that new agreement, represented in writing that they were acquiring DynaVision's interest "solely for [their] own account . . . without the financial participation of [a third party]."[106]

Although Joiner pointed to nothing in the Operating Agreement that would require the Active Members to make these representations, he or his clients apparently thought Krevolin would agree that the Agreement, read as a whole,

---

[106] Joiner was probably following Ledford's instructions. DynaVision's principals had authorized Ledford to "negotiate, execute, and convey the interests of" DynaVision to the Active Members "on such terms and conditions and [he] deem[ed] equitable and just." See supra part I.C. The representation called for by the new agreement was one of the "terms and conditions" Ledford insisted on; if not, Joiner thought it up on his own.

required that the representations be made.[107]  If Krevolin had agreed, he would have advised his clients that they could not honestly make such misrepresentations without inviting DynaVision to claim fraud.  See McFarland v. Kim, 275 S.E.2d 364, 366 (Ga. Ct. App. 1980) (holding that misrepresentations about present state of mind are actionable as fraud).  The misrepresentations would also have given DynaVision an affirmative defense in the event the Active Members sued for specific performance.  Defending an action for fraud or countering an affirmative defense in a suit for specific performance would be expensive and could be very unpleasant; Joiner apparently thought Krevolin would therefore advise his clients to abandon their plans and continue to manage Signature in partnership with DynaVision.

Krevolin's response, in a letter to Joiner dated April 16, was brief:  The Active Members would not make the representations Joiner's letter was seeking, and moreover, if DynaVision refused to close, the Active Members would take it to court.  As far as the Active Members were concerned, their business relationship with DynaVision's principals was at an end.  The principals' threat of litigation if

---

[107]  Neither of plaintiffs' briefs on appeal mentions the new agreement Joiner sent Krevolin in his April 11 letter.  Consequently, we do not know whether plaintiffs' counsel discovered something in the Operating Agreement that would have justified Joiner's demand that the Active Members make the representations that the new agreement, if executed, would have called for.

the Active Members did not abandon the Put and Call had gone for naught. Joiner informed Ledford of Krevolin's response, and, after considering DynaVision's options,[108] Ledford instructed Joiner to go forward with the closing on April 30, as previously agreed.[109]

## 2.

<u>DynaVision's principals could not have persuaded the Active Members to remain with the company, obtained a management team to replace them, or located a buyer for Signature, even if Peeples admitted his involvement.</u>

DynaVision's principals have conceded that they were unable to persuade the Active Members or Smith individually to remain with Signature and that they were unsuccessful in finding a suitable management team to replace them. They likewise have conceded that they had no success in locating a carpet company or an investor willing to purchase the company. Two of the three carpet

---

[108] DynaVision's principals had two options. One was to close the deal and take the $3.5 million on the table. If they wanted to sue the Active Members, they could do that later—and they eventually did. The other option was to refuse to close and defend the Active Members' expected suit for specific performance. We infer that they eschewed this option because it was less attractive economically.

[109] The record does not reveal what Joiner and Ledford said to one another after Joiner received Krevolin's letter. We infer that they decided that DynaVision had no basis for refusing to transfer its interest to the Active Members; the § 9.5 Put and Call provision of the Operating Agreement required them to capitulate. On April 25, Joiner wrote Krevolin and acknowledged that the transaction would close on April 30. His letter made no reference of Krevolin's rejection of his demands regarding the representations and the Green Road Property.

73

manufacturers Ledford and O'Dell contacted, Mohawk Carpets and Clay Miller Carpets, expressed no interest in buying Signature, even if doing so meant keeping the firm out of Peeples's hands.[110] Jerry Thomas of Matel Carpets expressed interest but only if Smith and the other Active Members would be willing to stay with Signature, which they were not.

In their brief to us, however, plaintiffs argue that Ledford and O'Dell would have been able to find a buyer for $8.5 million if Peeples had simply admitted his involvement in the Put and Call. With a buyer's commitment in hand, DynaVision would have then purchased the Active Members' interest for $3.5 million and reaped a $5 million profit.

Plaintiffs explain that once Peeples admitted his involvement, DynaVision's principals would have discovered that he agreed to pay $10 million for Signature (including $3.5 million to DynaVision). Ledford and O'Dell would have then had two excellent selling points when offering Signature to Mohawk, Clay Miller, and Matel. First, because Peeples was going to pay $10 million for Signature, their asking price of $8.5 million was not only reasonable, it was an exceptional bargain. Second, Peeples saw Signature as an effective way to reach the hospitality industry. By buying Signature, Peeples's competitors could gain entry to the

---

[110] See supra part I.B.

hospitality market and, at the same time, keep Peeples out. Plaintiffs argue:

> Had [DynaVision] known the truth, DynaVision's chances of finding a buyer willing to pay more than $7 million for [Signature] would have increased dramatically.
> . . . .
> Potential buyers and investors would certainly view the [Active Members'] agreement to sell [Signature] for $10 million to the Peeples Group as material. Thus, those contacted by DynaVision during the [thirty-day] election period may have acted differently, themselves, had they known of the agreement between the Peeples Group and the Active Members. Such knowledge may have increased their assessment of the value of the company or validated the value mentioned by DynaVision. Moreover, knowledge of a strategic acquisition by Shelby Peeples might have inspired those with marketing experience to assist DynaVision in order to maintain their competitive advantage. Knowledge of the truth could have enabled DynaVision to find a purchaser and/or marketing group for [Signature].

Appellants' Br. at 39–40.

Several flaws in plaintiffs' argument are immediately obvious. First, there is no support in the record for the statement that Peeples agreed to pay the Active Members $10 million for Signature at any time, let alone during the thirty-day election period. The most Peeples ever offered for Signature was roughly $6.5 million. In the January 21 letter of intent, Peeples discussed loaning the Active Members $3.5 million to enable them to purchase DynaVision's interest and then forgiving the loan and paying them $3 million for Signature's assets once they

75

acquired the company.[111]  In actuality, Peeples paid around $6 million to acquire

Signature.  Following the closing, he forgave the $3.5 million loan he had given

the Active Members and paid $2.25 million for Signature's assets.  He lowered the

price upon discovering an error in the company's books.

To arrive at the $10 million figure, plaintiffs add the bonuses Peeples

agreed to pay the Active Members under the Asset Purchase Agreement and

employment contracts[112] to the amount he actually paid for Signature's assets.[113]

The amount of these bonuses, however, was contingent on Signature's future

performance; the Active Members would only be eligible if Signature made a

profit above a certain amount on a yearly basis.[114]  Consequently, the bonuses are

---

[111]  See supra part I.B.

[112] These agreements are set out in the text in part I.D, supra.

[113] The Plaintiffs' brief states:

> The defendants purchased the assets of [Signature] for consideration that was
> valued at over $10 million at the time of their agreement. . . .  The bonuses in the
> Asset Purchase Agreement, which are capped at $5 million, combined with the
> direct payments to the Active Members and the forgiveness of the loan used to
> buy out DynaVision, exceeds $10 million.

There is no reference in the Asset Purchase Agreement to any bonuses "capped at $5 million," so
we assume plaintiffs refer to the bonus provisions referred to in note 30, supra.

[114] The Asset Purchase Agreement states:

> In addition to the base salary, each of the Active Members shall be entitled to an
> annual bonus, equal to twenty percent (20%) of the amount by which the net pre-
> tax profits of [Peeples] exceed One Million Five Hundred Thousand Dollars on an

76

not part of Peeples's payment for Signature; they are simply part of the Active Members' compensation arrangements for their continued service with the company.

Second, plaintiffs have not explained how they would have learned of the price Peeples intended to pay for Signature.[115] According to the Georgia Court of Appeals, the Active Members had no obligation under the Operating Agreement to reveal the details of their plan. Ledford, 618 S.E.2d at 633–36. If Paul Walker had asked about these details, Peeples's response would therefore undoubtedly have been that it was none of his business. This is essentially what Krevolin told Joiner when Joiner demanded that the Active Members represent prior to closing that they were purchasing DynaVision's interest "solely for [their] own account" and "without the financial participation of any other Person," meaning without Peeples's participation.

Plaintiffs would therefore not have been able to lure potential buyers by

---

annual basis: provided, however (a) shortfalls in annual net pre-tax profits shall be carried forward to succeeding years . . . .

The employment contracts add the caveat that "the maximum amount payable by Employer to Employee [in bonuses] shall be one [$1.6 million]."

[115] In the state court case against the Active Members and Signature, plaintiffs claimed that it was not until August 12, 2003, when they took Ownbey's deposition, that they learned of the price Peeples paid for Signature and the terms of his employment arrangement with the Active Members. The next day, they moved the court for leave to amend their complaint to add Peeples as a party defendant. See supra part II.A.

telling them that Peeples offered $10 million for the company. Instead, plaintiffs'

best selling pitch was the one they actually used: Peeples was going to acquire

Signature, and Peeples's competitors would benefit economically if they stepped

in, bought the company, and kept it from falling into Peeples's hands.

3.

The principals had to choose between purchasing the Active Members' interest and

risking the loss of their investment or selling their interest for a $3.5 million profit.

DynaVision's principals had thirty days to decide whether to buy or sell.

They opted to sell and received a $3.5 million profit, an extraordinary return on

their initial investment.[116] Ledford and O'Dell also received the release of their

obligation to FNBC to guarantee payment of the $911,000 loan the bank had given

Signature.[117] Had they opted to buy instead, they would have assumed the risk that

---

[116] The record indicates that only a small initial investment was made. DynaVision's principals (1) obtained the $200,000 line of credit FNBC gave Signature when it commenced operations, (2) guaranteed, in part, the $630,000 loan the Dalton Whitfield Bank gave Leasing to purchase the Green Road Property in October 1999, and (3) guaranteed, in part, the $911,000 loan FNBC gave Signature on October 24, 2001. See supra part I.A.

[117] Ledford and O'Dell were not entitled to such release. The § 9.5 Mandatory Put and Call provision specified that the "sale [of DynaVision's interest] shall be for cash at closing, but all loans from and guaranties executed by the selling Members must be paid in full and released prior to closing." The Operating Agreement defines "Members" as DynaVision, Smith, Thomas, and Ownbey. See supra part I.A. Ledford and O'Dell were members of DynaVision, but were not Members within the meaning of the above language. Their personal guarantees should have remained in force. Were DynaVision to have bought the Active Members' interests instead of selling out, in addition to paying the Active Members $3.5 million in cash, it would have been required to obtain their release as guarantors of FNBC's $911,000 loan to Signature and, further,

78

the company would have to close down unless they found a management team to run it. Moreover, without a management team, they would have had great difficulty selling the company. Potential buyers, knowing that Signature's value was diminishing, perhaps exponentially, would have been able to simply stand by and wait for the day when the principals had no alternative but to take whatever price they could get.

Faced with these alternatives, DynaVision's principals had to choose the one that satisfied their economic self-interest: They had to sell. As the Georgia Court of Appeals, drawing on what Ledford and O'Dell had to say on deposition,[118] observed:

> Either the Active Members' interest in [Signature] was worth $3.5 million to Dyna-Vision or it was not. The fact that Peeples financed the offer could not have materially affected Dyna-Vision's decision-making with respect to [Signature's] value, because if Dyna-Vision chose to buy the Active Member's interest, it could not force Peeples (or any other prospective buyer) to buy [Signature] for a fixed price. And there is no evidence in the record that Dyna-Vision had an interested buyer or that [Signature] had any value to any other prospective buyer. Moreover, both Ledford and O'Dell deposed that, even if they could have raised the money to buy out the Active Members, owning [Signature] without the Active Members would have been "foolish" and "made no sense" because the Active

---

to satisfy any obligations they may have incurred on Signature's behalf in the process of carrying on the company's business.

[118] The deposition testimony they gave in state court is part of the record here.

Members were the heart of [Signature's] value. As O'Dell admitted "we didn't really have a choice. . . . We didn't have a management group. . . . The day the put and call came in, I wouldn't give two cents for finding a group to replace them." Because Peeples' involvement did not affect the value of the Active Members' interest, it was immaterial.

Ledford, 618 S.E.2d at 634–35.

We began this discussion by stating that to obtain a reversal of the district court's determination that they failed to create a jury issue as to the reliance element of their Rule 10b-5(b) claims, plaintiffs had to convince the court that the evidence, considered in the light most favorable to them, yielded circumstantial facts from which a jury reasonably could infer that if Peeples had not denied his involvement in the Put and Call, DynaVision's principals would have purchased the Active Members' interest. Peeples contends that the evidence establishes circumstantial facts that yield but one inference: DynaVision's principals had no option but to sell. We agree. Peeples's misrepresentations played no causative role in the DynaVision principals' decision to sell to the Active Members.

## C.

Perhaps realizing the futility of the arguments they have advanced, plaintiffs present an argument that they failed to present to the district court while it was considering the merits of their claims. The argument is founded on § 9.1 of the

80

Operating Agreement, which precludes a Member from pledging an interest in Signature as collateral for a loan.[119] Plaintiffs contend that the Active Members breached this provision by pledging their interests in Signature as collateral for the $3.5 million loan they obtained from Peeples.[120] They did not know about the pledge prior to the April 30 closing, they represent, but would have suspected it had Peeples admitted that he was behind the Put and Call. DynaVision now argues that had it suspected that the Active Members had pledged their interests in violation of § 9.1, it would have rejected the Put and Call. Then, if the Active Members sued for specific performance, it would have asserted the breach of § 9.1 as an affirmative defense, citing the Georgia principle of equity—that "a party seeking specific performance of a contract must show substantial compliance with his part of the agreement, and the breach of a material condition will bar a decree of specific performance." Saine v. Clark, 219 S.E.2d 407, 408–09 (Ga. 1975).

The allegation that DynaVision's principals would have rejected the Put and

---

[119] See supra note 105.

[120] Peeples was aware of § 9.1's prohibition against the Active Members pledging their interests as collateral for a loan. In his January 21, 2002, letter to the Active Members, see supra part I.A, he stated that, "to the extent of any conflict in the provisions of this Letter and the provisions of the Signature Operating Agreement, the provisions of the Signature Operating Agreement shall prevail and the conflicting provision(s) of this Letter shall be void and of no effect whatsoever." In other words, if DynaVision should have claimed that the Active Members had pledged their interests in Signature as collateral for the $3.5 million loan, Peeples would have treated the loan as unsecured.

81

Call had they suspected a violation of § 9.1 does not appear in plaintiffs' complaint as part of the Count One federal securities law claims. Nor was it made in plaintiffs' response to Peeples's motion for summary judgment.[121] Plaintiffs' response on summary judgment does contain a factual statement that the Active Members pledged their interests in disregard of § 9.1. This statement, however, was not made as part of plaintiffs' argument on the reliance element—plaintiffs did not assert that but for Peeples's misrepresentations, DynaVision would have elected to purchase the Active Members' interest.[122] Moreover, in its order granting Peeples summary judgment, the district court made no reference to the argument plaintiffs now present, and the plaintiffs did not move the court pursuant to Rule 59(e) to reconsider its decision on the ground that it had overlooked the argument.

The argument appeared for the first time in plaintiffs' response to Peeples's post-judgment motion for PSLRA sanctions. Peeples, in his motion, argued that plaintiffs lacked a factual basis to assert that DynaVision's principals relied to their

---

[121] The plaintiffs also failed to raise this argument at any time during the state court litigation.

[122] During oral argument before this panel, Peeples's attorney told the court that plaintiffs' counsel was presenting a reliance argument he had not presented to the district court. Plaintiffs' counsel disagreed, and cited a page in plaintiffs' response to Peeples's motion for summary judgment where counsel said the argument appeared. The page contains the factual statement that the Active Members breached § 9.1 without any reference to a reliance argument.

82

detriment on Peeples's misrepresentations. Then, plaintiffs finally argued that had they known about the misrepresentations, they would have rejected the Put and Call and refused to close. If the Active Members sued, they would have pled the breach of § 9.1 as an affirmative defense. The court's order denying Peeples's motion for sanctions, however, made no reference to this argument.

It requires no citation of authority to say that, except when we invoke the "plain error doctrine," which rarely applies in civil cases, we do not consider arguments raised for the first time on appeal. A mere recitation of the underlying facts, furthermore, is insufficient to preserve an argument; the argument itself must have been made below. See City of Nephi v. Fed. Energy Regulatory Comm'n, 147 F.3d 929, 933 n.9 (D.C. Cir. 1998) (holding that a party does not preserve an argument for appellate review by "merely informing the [district] court in the statement of facts in its opening brief [of the factual basis for the claim]"); Wasco Products, Inc. v. Southwall Tech., Inc., 166 Fed. App'x 910, 911 (9th Cir. 2006) (unpublished) ("Although [the argument was] stated in a statement of facts, it was never argued and never ruled upon. Without any proffered explanation for this default, the argument is waived."). Here, plaintiffs did not use the factual statement in arguing the reliance issue.

Because we are reversing the district court's rulings on the sanctions issues,

83

and given what we have said thus far in this opinion, we think it appropriate to say a word about the reach of § 9.1. Even if an Active Member had attempted to pledge of his or her interest in Signature as collateral for a loan without the consent of DynaVision and the other Active Members, § 9.1 would have rendered the pledge "void and of no effect." If the lender attempted to seize the interest in Signature to satisfy the debt, DynaVision and the other Active Members could claim that the pledge was void.[123] If the Active Member paid the loan, however, and no seizure occurred, DynaVision and the other Active Members could not have suffered injury on account of any § 9.1 breach. Nor could DynaVision have used the pledge as the basis for a lawsuit against the breaching Active Member.[124]

## V.

We now address what remains of plaintiffs' Count Four claims that Peeples

---

[123] If, prior to accepting the collateral, the lender knew that § 9.1 treated the pledge as void, whether the lender would prevail in a contest with DynaVision would be questionable.

[124] To be sure, the Operating Agreement was structured so as to prevent either side, DynaVision or the Active Members, from selling its interest in Signature to a third party if the other side objected. The Georgia Court of Appeals made this observation in Ledford, in commenting on the purpose behind § 9.2 of Article 9, the "Right of First Refusal" provision. Section 9.2 was "plainly intended to prevent outsiders from buying into [Signature]. In this way, the Members maintained control over who their business partners were to be." 618 S.E.2d at 633. However, once the Active Members invoked the Put and Call provision of § 9.5 and DynaVision did not elect within 30 days to purchase their interests, "the right of first refusal provisions of the Operating Agreement [became] moot since DynaVision [was] no longer . . . an owner in [Signature] possessing a right of first refusal." Ledford, 618 S.E.2d at 633. The court of appeals's analysis of the Operating Agreement's structure is straightforward and comports with logic and common sense. It should not have come as a surprise to plaintiffs' counsel.

aided and abetted Smith, Thomas, and Ownbey in breaching their fiduciary duties to Leasing and, separately, to Ledford and O'Dell as Members of Leasing.[125] Plaintiffs argue that Peeples aided and abetted two separate breaches of the obligation Smith, Thomas, and Ownbey assumed under the Limited Liability Company Act, O.C.G.A. § 14-11-305(1), as members and managers of Leasing, to "act in a manner" that they "believe[ed] in good faith to be in the best interests" of the company and "with the care an ordinarily prudent person in a like position would exercise under similar circumstances."[126] We affirm the district court's dismissal of the claims and hold that Peeples could not have aided and abetted a breach of fiduciary duty because, as a matter of law, no such breach occurred.

A.

---

[125] As indicated in part II.B.1, supra, Count Four alleged that Peeples aided and abetted Smith, Thomas, and Ownbey in breaching two of their fiduciary duties: to inform the plaintiffs that Peeples was supporting their Put and Call and to transfer the Green Road Property back to Leasing. Here, plaintiffs do not challenge the district court's reliance on the court of appeals's holding in Ledford v. Smith that the Active Members had no fiduciary duty to inform DynaVision of Peeples's involvement. Also, DynaVision obviously cannot state a Count Four claim about the Green Road Property because DynaVision did not hold an interest in Leasing or the Green Road Property and, therefore, could have suffered no injury by the alleged breach of any fiduciary duty in connection with the transfer of that property. Accordingly, the district court properly dismissed DynaVision's Count Four claim relating to the Green Road Property.

[126] See supra note 50, for the full text of O.C.G.A. § 14-11-305(1). Leasing's operating agreement is not part of the record in this case. We assume arguendo that an operating agreement existed and that Smith, as Leasing's president, assumed the duties the statute imposed. We also assume that Thomas and Ownbey were responsible for Smith's conduct since the complaint alleged that they were co-conspirators.

In support of their aiding and abetting claim, plaintiffs allege two separate breaches of fiduciary obligation. First, they contend that Smith breached her fiduciary duty by failing to inform Ledford and O'Dell that the document they signed before Cynthia Trammel at FNBC was a warranty deed. Had Smith disclosed the nature of the document to Ledford and O'Dell, plaintiffs submit, they would not have signed it. Second, plaintiffs contend that Smith, Thomas, and Ownbey breached their fiduciary duties to Leasing, Ledford, and O'Dell by refusing to convey the Green Road Property back to Leasing, pursuant to Paul Walker's demands, after the warranty deed was signed but before the sale of DynaVision's interest closed. Plaintiffs argue that Peeples aided and abetted these breaches so that the Active Members would be in a position to give him title to the Green Road Property after acquiring DynaVision's interest.[127]

The district court, concluding that Georgia did not recognize a cause of action for aiding and abetting the breach of a fiduciary duty, dismissed plaintiffs' claims. The Georgia Court of Appeals subsequently held, however, in Insight

---

[127] As proof that Peeples induced Smith and the Active Members to commit these statutory breaches, plaintiffs point to Peeples's January 21 letter of intent to the Active Members, which plaintiffs describe in their initial brief on appeal as a "contract[] to purchase the Green Road Property as part of the assets of [Signature]" and the promise Peeples made in the Asset Purchase Agreement to indemnify the Active Members for any expenses they might incur if held liable for refusing to accede to Paul Walker and Ledford's demand that Signature transfer the property back to Leasing.

86

<u>Techs., Inc. v. FreightCheck, LLC</u>, 633 S.E.2d 373 (Ga. Ct. App. 2006), that such an aiding and abetting claim is cognizable.[128]

In light of the court of appeals decision in that case, we assume for purposes of this case that the obligation § 14-11-305 imposes on limited liability company members and managers is, as plaintiffs' contend, a "fiduciary duty," and we therefore proceed to the merits of plaintiffs' aiding and abetting claims. As indicated above, plaintiffs' claims are founded on two distinct breaches of their statutory obligation. The breaches have to have occurred; otherwise, Peeples cannot be held liable for aiding and abetting. We therefore determine whether, as a threshold matter, a jury reasonably could find, as plaintiffs allege, that Smith and, subsequently, Smith, Thomas, and Ownbey breached the obligations they assumed under § 14-11-305 as members and managers of Leasing.

B.

---

[128] The elements of the claim are:

(1) through improper action or wrongful conduct and without privilege, the defendant acted to procure a breach of the primary wrongdoer's fiduciary duty to the plaintiff;
(2) with knowledge that the primary wrongdoer owed the plaintiff a fiduciary duty, the defendant acted purposely and with malice and the intent to injure;
(3) the defendant's wrongful conduct procured a breach of the primary wrongdoer's fiduciary duty; and
(4) the defendant's tortious conduct proximately caused damage to the plaintiff.

<u>Insight Technologies, Inc. v. FreightCheck, LLC</u>, 633 S.E.2d 373, 379 (Ga. Ct. App. 2006). at 379.

We begin with plaintiffs' argument that Smith should have explained the significance of the warranty deed that Ledford and O'Dell signed before Cynthia Trammel at FNBC. To analyze this argument, we proceed through the explanation that, according to the plaintiffs, Smith should have given in order to fulfill her fiduciary obligations. We then conclude that, as a matter of law, such an explanation would not have caused the plaintiffs to act differently than they actually did.

Smith's explanation, to be complete and leave no stone unturned, would have taken Ledford and O'Dell back to October 2001, when Ledford, O'Dell, and the Active Members applied to FNBC for a loan on behalf of Signature. That loan was intended to pay off Signature's current loans at FNBC, pay off the balance due on the note Leasing gave the Dalton Whitfield Bank,[129] and provide Signature with additional working capital. Signature needed in excess of $900,000 to accomplish all of this.

Smith would have reminded Ledford and O'Dell that Cynthia Trammel—the FNBC officer who processed their loan application and, before that, handled the loan they had obtained from the Dalton Whitfield Bank for Leasing—had to

---

[129] The note was in the principal amount of $630,000, the sum of money Leasing needed, and used, to purchase the Green Road Property. Smith, Thomas, Ownbey, Ledford, and O'Dell had signed the note and guaranteed its payment. See supra note 16.

submit their application to FNBC's board of directors for approval. She would also have explained that the board approved the loan subject to certain conditions, among them (1) that Ledford, O'Dell, Smith, Thomas, and Ownbey sign Signature's note, and thus guarantee its payment and (2) that Signature, joined by Ledford, O'Dell, Smith, Thomas, and Ownbey, give the bank a deed to secure debt on the Green Road Property.[130] This meant that if Leasing held title to the property, it would have to convey the property to Signature so that Signature, in turn, could deed the property unencumbered to FNBC to secure the loan. Ledford, O'Dell, and the Active Members had agreed to these conditions.

Next, Smith would have explained that Trammel, having obtained their consent to these conditions, took the steps necessary to close the transaction. One was to have the bank's lawyer, Todd McCain, conduct a title search of the Green Road Property. McCain conducted a search, issued an opinion, and delivered it to Trammel. The opinion stated that title to the property was held by Leasing and that Signature could not give the bank a deed to secure debt unless Leasing deeded the property to Signature before the loan closed.

---

[130] In handling the $630,000 Leasing loan at the Dalton Whitfield Bank, Trammel required the same five individuals sign the note and guarantee its payment. The inference is that they were responsible for Signature's business affairs to the same extent they were responsible for Leasing's affairs.

89

Smith would have gone on to say that the closing went as planned except that Signature gave the bank a deed to secure debt on property it did not own; Leasing had neglected to convey the Green Road Property to Signature. Trammel had overlooked McCain's caveat that the conveyance occur prior to closing. Her failure to obtain the necessary warranty deed from Leasing to Signature did not come to light until later, when she read McCain's opinion letter.

Upon reading McCain's letter, Trammel realized that she had to obtain a deed from Leasing to Signature so that the deed to secure debt Signature had given the bank would not be worthless.[131] To solve the problem, Trammel called McCain's office, and it prepared the warranty deed at issue. Trammel then called Smith. She told Smith that a "document" needed to complete the loan closing had to be signed and asked her to come to the bank with Ledford, O'Dell, Thomas, and Ownbey for that purpose. Smith immediately informed the others of Trammel's request. A day or so later, she arrived at the bank with Thomas and Ownbey and signed the document, the warranty deed, before a notary and a witness. When Ledford and O'Dell failed to appear, Trammel called Smith again. Smith, in turn, called Ledford, who contacted O'Dell, and they, too, signed the deed, before the

---

[131] The record does not contain a copy of the deed to secure debt Ledford, O'Dell and the others gave the bank; thus, we do not know whether, in signing it, they expressly warranted that Signature was giving the bank title to property it owned.

same notary and witness. At that time, plaintiffs argue, Smith should have informed them that the document was a warranty deed.

The position plaintiffs have taken throughout this litigation is that notwithstanding a full explanation by Smith—that Leasing had to convey the Green Road Property to Signature so that the $911,000 loan could go through—Ledford and Smith would not have signed the "document." We question whether Ledford and O'Dell would have refused to sign after Smith informed Trammel of their noncompliance, Trammel referred the matter to the bank's lawyer, McCain, and McCain contacted Ledford and O'Dell's lawyer. Ledford and O'Dell's lawyer would have informed them of the legal consequences that might flow if they still refused to accede to the conveyance of the Green Road Property to Signature. In any event, what counsel would have had to say has a bearing on whether, in the final analysis, Smith's failure to tell Ledford and O'Dell that the "document" they were to sign was a warranty deed constituted a breach of Smith's § 14-11-305 obligation to "act in a manner . . . she believes in good faith to be in the best interests of" Leasing and its members, "with the care an ordinarily prudent person in a like position would exercise."

McCain would have told Ledford and O'Dell's lawyer that Ledford, O'Dell, Smith, Thomas, and Ownbey induced the bank to loan Signature $911,000 on the

condition that Signature give the bank a deed to secure debt on the Green Road Property. To do that, Signature would have to possess clear title to the property. Although the bank insisted that these five individuals guarantee the payment of the loan by co-signing Signature's note, their guarantee was not enough; the bank needed collateral in the form of a deed to secure debt from Signature. Another reason why the bank needed this additional security is that part of the $911,000 loan would be used to pay off Leasing's debt to the Dalton Whitfield Bank, thereby relieving Leasing's guarantors, including Ledford and O'Dell, of potential liability for Leasing's non-payment of the debt, and, at the same time, depriving Signature of the full value of the loan.[132]

McCain would have then observed that, in executing Signature's deed to secure debt, Ledford and O'Dell represented that Signature owned the property, on the surface a false representation. If making such representation was intentional, as their current position seems to imply, they obtained the bank's funds under false pretenses. And, moreover, Leasing lined its pockets, and the guarantors of

---

[132] The record does not indicate the balance due on Leasing's $630,000 note to the Dalton Whitfield Bank. An inescapable inference is that the payoff consumed a goodly portion of the amount due on that note and that Signature would be deprived of the benefit of the payoff unless it owned the Green Road Property. Also inescapable is the inference that in inducing the FNBC to make the loan on the conditions its board of directors dictated, Ledford, O'Dell, Smith, Thomas, and Ownbey were acting as members of Leasing as well as on behalf of Signature.

Leasing's debt to the Dalton Whitfield Bank were relieved of potential liability, at Signature and FNBC's expense. McCain would inform Ledford and O'Dell's counsel of the elements of the federal bank fraud statute, 18 U.S.C. § 1344, that according to the Eleventh Circuit Court of Appeals, in United States v. De La Mata, 266 F.3d 1275, 1298 (11th Cir. 2001), makes it a crime to knowingly make materially false representations to a federally insured bank for the purpose of obtaining money.[133] Ledford and O'Dell might be subject to prosecution even if they intended to repay Signature's $911,000 loan.[134]

Given the representations Smith and the others made to induce the FNBC to make the Signature loan and the benefit that inured to Leasing and its guarantors when its note to the Dalton Whitfield Bank was paid off, we fail to discern how Smith could be said to have breached her § 14-11-305 obligation to Leasing, Ledford, and O'Dell. She did precisely what she and the others had promised the

---

[133] Although the record does not reveal that FNBC was insured by the Federal Deposit Insurance Corporation, the probability is that it was. And if not, Ledford and O'Dell would be amenable to prosecution under Georgia law for theft by deception. See, e.g., O.C.G.A. § 16-8-3; Gentry v. State, 414 S.E.2d 696, 697 (Ga. Ct. App. 1992).

[134] See United States v. Hollis, 971 F.2d 1441, 1452 (10th Cir. 1992) (holding that a "person violates the bank fraud statute when he knowingly executes a scheme to obtain money from a financial institution by means of false or fraudulent representations . . . . [I]f a defendant knowingly provided materially false information in order to induce the loan, the crime is complete, and it is irrelevant whether or not he intended to repay or was capable of repaying it.").

bank they would do. In sum, plaintiffs failed to establish a breach on Smith's part and, as a result, failed to make out a case of aiding and abetting against Peeples.

C.

This brings us to the second alleged breach, the refusal of Smith, Thomas, and Ownbey to accede to Paul Walker and Ledford's demand that they cause Signature to convey the Green Road Property to Leasing.[135] According to plaintiffs, O.C.G.A. § 14-11-305 obligated the Active Members, as members or managers of Leasing, to make the conveyance. Plaintiffs ignore the fact that § 14-11-305 actually obligated the Active Members, as managers of Signature, not to do that: if they had made the conveyance, the Active Members would, in effect, have given Leasing the part of the $911,000 FNBC loan proceeds Signature used to pay off Leasing's note to the Dalton Whitfield Bank while gaining Signature nothing in return. Given our disposition of the first breach, it would be inconsistent to hold that § 14-11-305 obligated the Active Members to cause Signature to transfer the

---

[135] Walker and Ledford made this demand on behalf of Ledford, O'Dell, and Bryan Walker, qua Leasing members, after the Put and Call's 30-day election period ended and DynaVision became obligated by operation of § 9.5 of the Operating Agreement to transfer its interest in Signature to the Active Members. If this were not the case, and DynaVision maintained its interest in Signature until the April 30, 2002, closing, the Active Members could not have complied with Walker and Ledford's demand; Signature could not have conveyed the Green Road Property to Leasing unless DynaVision's representative on Signature's board of directors, Edward Staten, consented to the conveyance. His consent might be problematic since not all of DynaVision's members were members of Leasing as well.

94

property back to Leasing.  The second breach therefore fails as a foundation for plaintiffs' second aiding and abetting claim against Peeples.

The district court, had it entertained Count Four on the merits, would have been required to grant Peeples summary judgment.  We accordingly affirm its judgment dismissing the count for failure to state a claim for relief.

VI.

A.

In his cross-appeal, Peeples argues that the district court abused its discretion in refusing to sanction plaintiffs and their attorneys under the PSLRA for filing and prosecuting the federal securities law claims in this case.[136]  The PSLRA requires the district court, upon final adjudication of the action, to make "specific findings regarding compliance by each party and each attorney . . . with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion."[137]  15 U.S.C. § 78u-4(c)(1).

---

[136]  Peeples contends that the district court's December 22, 2005, summary judgment order rejecting plaintiffs' claims necessarily makes it clear that plaintiffs' Count One federal securities law claims were baseless at the time they were brought.

[137]  15 U.S.C. § 78u-4(c) states in pertinent part:

> (c) Sanctions for abusive litigation
> (1) Mandatory review by court
> In any private action arising under this chapter, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each

95

The district court makes these findings as it normally would do under Rule 11.  See

Citibank Global Mkts., Inc. v. Rodriguez Santana, 573 F.3d 17, 32 (1st Cir. 2009)

("[T]he PSLRA . . . does not alter the standards used to judge compliance with

Rule 11."); Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc., 186

F.3d 157, 167 (2d Cir. 1999) ("The PSLRA thus does not in any way purport to

alter the substantive standards for finding a violation of Rule 11 . . . .").  Rule 11(b)

(as written at the time the district court ruled) states, in pertinent part:

> (b) **Representations to Court.**  By presenting to the court (whether
> by signing, filing, submitting, or later advocating) a pleading, written
> motion, or other paper, an attorney . . . is certifying that to the best of
> of the person's knowledge, information, and belief, formed after an
> inquiry reasonable under the circumstances,—
>     (1) it is not being presented for any improper purpose, such as to
> harass or to cause unnecessary delay or needless increase in the cost
> of litigation;
>     (2) the claims . . . and other legal contentions therein are warranted
> by existing law or by a nonfrivolous argument for the extension,
> modification, or reversal of existing law or the establishment of new
> law;
>     (3) the allegations and other factual contentions have evidentiary
> support or, if specifically so identified, are likely to have evidentiary
> support after a reasonable opportunity for further investigation or
> discovery . . . .
>
> If the district court finds that a party or attorney violated any of these

---

requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any
complaint . . . .

provisions, it <u>must</u> impose sanctions.[138]  15 U.S.C. § 78u-4(c)(2).  The PSLRA thus strips the district court of its discretion to excuse a Rule 11 violation.  This differs from the ordinary Rule 11 context, where the district court retains discretion to excuse an attorney's negligence, mistake, or incompetence and elect not to impose sanctions;[139] Rule 11(c) provides that sanctions <u>may</u> be imposed "upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation."[140]  Fed. R. Civ. P. 11(c) (2006).[141]

---

[138]  15 U.S.C. § 78u-4(c) states, in pertinent part:

> (2) Mandatory sanctions
> If the court makes a finding under paragraph (1) that a party or attorney violated any requirement of Rule 11(b) . . . as to any complaint, responsive pleading, or dispositive motion, the court shall impose sanctions on such party or attorney in accordance with Rule 11 . . . .  Prior to making a finding that any party or attorney has violated Rule 11 . . . the court shall give such party or attorney notice and an opportunity to respond.

[139]  This discretion derives from Rule 11's plain text: "If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court <u>may</u> . . . impose an appropriate sanction on the attorneys, law firms, or parties . . . ." Fed. R. Civ. P. 11(c)(1) (2006) (emphasis added).

[140]  The court may not, however, award monetary sanctions against a represented party for a subdivision (b)(2) violation.  Fed. R. Civ. P. 11(c)(2)(A) (2006).

[141]  The quoted language is from the version of Rule 11 in effect when the district court made its sanctions rulings on March 21, 2006.  Rule 11 also provided that "[a]bsent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partners, associates, and employees."  Fed. R. Civ. P. 11(c)(1)(A) (2006).

The current version of Rule 11 has been materially the same since its amendment in 1993.  The Advisory Committee's notes to the 1993 amendments state:

> The sanction should be imposed on the persons—whether attorneys, law firms, or parties—who have violated the rule or who may be determined to be

B.

We now explain how the district court should conduct its sanctions

assessment and how we review its sanctions decision. The district court is tasked

with making "specific findings" regarding attorney compliance with Rule 11(b)'s

requirements.[142] The standard for measuring such compliance is an objective

responsible for the violation. The person signing, filing, submitting, or advocating a document has a nondelegable responsibility to the court, and in most situations is the person to be sanctioned for a violation. Absent exceptional circumstances, a law firm is to be held also responsible when, as a result of a motion under subdivision (c)(1)(A), one of its partners, associates, or employees is determined to have violated the rule. Since such a motion may be filed only if the offending paper is not withdrawn or corrected within 21 days after service of the motion, it is appropriate that the law firm ordinarily be viewed as jointly responsible under established principles of agency. This provision is designed to remove the restrictions of the former rule. Cf. Pavelic & LeFlore v. Marvel Entertainment Group, 493 U.S. 120 (1989) (1983 version of Rule 11 does not permit sanctions against law firm of attorney signing groundless complaint).

The revision permits the court to consider whether other attorneys in the firm, co-counsel, other law firms, or the party itself should be held accountable for their part in causing a violation. When appropriate, the court can make an additional inquiry in order to determine whether the sanction should be imposed on such persons, firms, or parties either in addition to or, in unusual circumstances, instead of the person actually making the presentation to the court. For example, such an inquiry may be appropriate in cases involving governmental agencies or other institutional parties that frequently impose substantial restrictions on the discretion of individual attorneys employed by it.

[142] The district court must make findings regarding all of plaintiffs' counsel. H. Greely Joiner, LLC is listed as counsel on plaintiffs' complaint, though no counsel from the firm signed the complaint. In their sanctions briefing to the district court and their Petition for Rehearing, plaintiffs argue that H. Greely Joiner, LLC's involvement was limited; thus, their counsel should not be subject to sanctions. On remand, the district court must consider the extent of H. Greely Joiner, LLC's involvement with the lawsuit and decide whether sanctioning counsel would be appropriate.

In addition to assessing plaintiffs' counsel's compliance with Rule 11(b), the district court is required to assess the parties' compliance as well. Because we find no basis for sanctioning the parties, the ensuing discussion focuses on plaintiffs' counsel's compliance.

standard: what a reasonably competent attorney would have done under the circumstances.[143]

In the case at hand, the PSLRA required the district court to determine whether plaintiffs' attorneys violated Rule 11(b) by certifying, "after an inquiry reasonable under the circumstances," that Count One's federal securities law claims were "not being presented for any improper purpose," Fed. R. Civ. P. 11(b)(1), were "warranted by existing law or by a nonfrivolous argument for [a change in the] law," Fed. R. Civ. P. 11(b)(2), and "h[ad] evidentiary support," Fed. R. Civ. P. 11(b)(3).[144] Ordinarily, compliance determinations are made in a proceeding akin to a bench trial; after entertaining the parties' submissions and argument of counsel, the court enters "specific findings" "in the record" regarding counsel's performance. 15 U.S.C. § 78u-4(c)(1).[145] These "specific findings" are

---

[143] Kaplan v. DaimlerChrysler, A.G., 331 F.3d 1251, 1255 (11th Cir. 2003); Donaldson v. Clark, 819 F.2d 1551, 1556 (11th Cir. 1987) (en banc) ("Rule 11 as amended incorporates an objective standard"); Hashemi v. Campaigner Publ'ns, Inc., 784 F.2d 1581, 1583 (11th Cir. 1986) (noting that Rule 11 incorporates an objective standard that is more stringent than the original good-faith formula that the district courts applied prior to the 1983 amendment); Paganucci v. City of New York, 993 F.2d 310, 312 (2d Cir. 1993) ("[T]he applicable test is whether a reasonably competent attorney would have acted similarly.").

[144] See supra page 96 for the pertinent text of Rule 11(b).

[145] The § 78u-4(c)(1) proceeding to determine the parties' and their attorney's compliance with Rule 11(b) is not an adversary proceeding in the sense that it is initiated on the motion of, say, the prevailing party. Rather, the proceeding is initiated by the court. The prevailing party will nevertheless be advocating for the imposition of sanctions, and the court will be focusing on the

99

the functional equivalent of what Federal Rule of Civil Procedure 52(a)(1)

designates as findings of fact and conclusions of law[146] and are necessary for

meaningful appellate review of the district court's sanctions decision.  In this case,

the district court did not conduct a bench-trial type of proceeding.  Rather, after

Peeples moved the court to alter or amend its judgment, see Fed. R. Civ. P. 59(e),

on the ground, among others, that the court had not made its PSLRA Rule 11(b)

compliance determinations, the court requested the parties to brief the PSLRA

issues and rendered its sanctions decision on the basis of the parties' briefs,

without oral argument.

We review the court's sanctions decision, which is founded on the "specific

findings," for abuse of discretion.  See Cooter & Gell v. Hartmax Corp., 496 U.S.

384, 409 110 S. Ct. 2447, 2463, 110 L. Ed. 2d 359 (1990) ("[A]n appellate court

---

explanation of the losing party and its attorneys of why they did not violate the Rule.  We have
found no reported PSLRA decision that addresses the question of who has the burden of proof in
a § 78u-4(c)(1) proceeding.  What is clear, however, is the court's obligation to enter into the
record "specific findings" regarding the parties' and their attorney's Rule 11(b) compliance.  It is
obvious that, to make such findings, the court must conduct a productive inquiry, though holding
a hearing is not required.

[146] Rule 52(a)(1) states, in pertinent part:

> In an action tried on the facts without a jury . . . the court must find the facts
> specially and state its conclusions of law separately.  The findings and
> conclusions may be stated on the record after the close of the evidence or may
> appeal in an opinion or memorandum of decision filed by the court.

should review the district court's decision in a Rule 11 proceeding for an abuse of discretion."); Kaplan v. DaimlerChrysler, A.G., 331 F.3d 1251, 1255 (11th Cir. 2003) ("We review Rule 11 sanctions under the abuse-of-discretion standard."). "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." McGregor v. Bd. of Comm'rs of Palm Beach County, 956 F.2d 1017, 1022 (11th Cir. 1992) (quoting Cooter & Gell, 496 U.S. at 405, 110 S. Ct. at 2461).

We pause here to elucidate the meaning of abuse of discretion review in the PSLRA context. We find it helpful to explain how abuse of discretion review differs from de novo review.

> By definition . . . under the abuse of discretion standard of review there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call. That is how an abuse of discretion standard differs from a de novo standard of review. As we have stated previously, the abuse of discretion standard allows "a range of choice for the district court, so long as that choice does not constitute a clear error of judgment."

United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc) (quoting Rasbury v. I.R.S., 24 F.3d 159, 168 (11th Cir. 1994)). "The application of an abuse-of-discretion review recognizes the range of possible conclusions the trial judge may reach." Id. Therefore, when reviewing the elements of a district court's decision of whether to impose sanctions, the relevant question is not whether we

would have come to the same decision if deciding the issue in the first instance.

The relevant inquiry, rather, is whether the district court's decision was tenable, or,

we might say, "in the ballpark" of permissible outcomes.

When deciding to impose sanctions under Rule 11(b)(1) and (b)(3), the

ballpark will usually be larger than the ballpark in a Rule 11(b)(2) determination.

That is because Rule 11(b)(1) and (b)(3) determinations are usually more fact-

based and may involve credibility assessments.[147]  In a Rule 11(b)(2)

determination, where the only issue is whether the asserted claim is warranted by

existing law, the size of the ballpark will depend on how clear the substantive law

is.[148]  Where the substantive law is very clear as to when a particular claim is

permissible, the district court is more constrained in deciding whether the claim is

warranted by existing law.  In some cases, the law will be so clear that the district

court can only decide the question one way without abusing its discretion.

We provide an example to illustrate these points.  Suppose a district court

grants a Rule 12(b)(6) motion to dismiss a claim, but declines to find a violation of

---

[147]  On appeal, we review whether the district court's findings of fact were "clearly erroneous" and whether the court's legal rulings were based on "an erroneous view of the law."  See Cooter & Gell, 496 U.S. at 405, 110 S. Ct. at 2461.

[148]  The Rule 11(b)(2) determination is whether counsel's view of the law supporting the plaintiff's claim is tenable—a legal rather than a factual determination.  There may be wider discretion in deciding what is tenable in a Rule 11(b)(2) decision regarding whether counsel's argument for a change in the law was nonfrivolous.

Rule 11(b)(2).  The plaintiff appeals the Rule 12(b)(6) dismissal, and the defendant cross-appeals the denial of Rule 11(b)(2) sanctions.  In the plaintiff's appeal, applying the de novo standard of review, we affirm the Rule 12(b)(6) dismissal because there is no legal support for the claim.  In the defendant's cross-appeal, applying the abuse of discretion standard, we affirm the denial of sanctions because the district court's Rule 11(b)(2) compliance finding was in the ballpark of permissible outcomes.  If, however, the law governing the plaintiff's claim was well-settled, and clearly precluded the claim, the ballpark would be very small.  If, under those circumstances, we concluded that the plaintiff's, and thus the district court's, view of the law was untenable, we would reverse the district court's sanctions ruling and remand the case for the imposition of an appropriate sanction.

## C.

### 1.

In the case at hand, the district court found no merit in any of the Count One claims and therefore granted Peeples's motion for summary judgment.  Although those claims lacked merit, the court declined to impose sanctions because

> the Court cannot conclude that the position taken by the Plaintiffs and their counsel was unreasonable or in bad faith.  Other evidence in the record . . . permitted Plaintiffs and their counsel to present reasonable, good faith arguments that Plaintiffs acted as they did based on Defendant's conduct, and that Plaintiffs consequently had satisfied the

103

causation and reliance elements of their securities law claims.  The Court therefore cannot determine that Plaintiffs and their counsel lacked a reasonable basis in fact for filing this action, or that Plaintiffs and their counsel knew or should have known that they lacked a reasonable basis in fact.

The district court buttressed its decision by amending its order granting Peeples summary judgment to add the following findings of fact, which relate to three of Rule 11(b)'s subdivisions:

(1) Plaintiffs and their counsel did not present this action for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
(2) The claims and legal contentions presented by Plaintiffs and their counsel in this action were warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
(3) The allegations and other factual contentions presented by Plaintiffs and their counsel had evidentiary support or were likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .[149]

The findings and conclusions quoted above do not measure up to the specific findings required by the PSLRA and are inadequate for appellate review.  We say this for several reasons.  First, the court's statement that "the Court cannot

---

[149]  The court's order also referred to the fourth Rule 11(b) subdivision, with this statement: "(4) Any denials of factual contentions made by Plaintiffs and their counsel were warranted on the evidence or were reasonably based on a lack of information or belief."  The court did not cite "any denials of factual contentions made by Plaintiffs and their counsel" so we assume that the court was referring to the defendants' answer to plaintiffs' complaint.

conclude that the position taken by the Plaintiffs and their counsel was unreasonable or in bad faith" and that "it therefore cannot determine that Plaintiffs and their counsel lacked a reasonable basis in fact for filing this action" appears to be a statement that the party with the burden of proof failed to adduce sufficient evidence to warrant a finding of noncompliance with Rule 11(b).[150] The statement is a legal conclusion, not a finding of fact. Moreover, the court does not lay out the facts on which the conclusion is based. Second, the court refers to "other evidence in the record" that presumably supported plaintiffs' and their attorney's legal and factual theories, but it does not identify that evidence. Third, the statements relating to Rule 11(b)'s subdivisions are mere conclusions, composed mainly in the subdivisions' words.

Specifically on (b)(2), the court, after rejecting plaintiffs' Count One claims on the merits, finds that the claims "were warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." The court does not explain why it granted summary judgment on plaintiff's claims but found that they "were warranted by existing law." Was it that the claims were tenable, but that the court had a

---

[150] The court appears to have saddled Peeples with the burden of proving that a reasonably competent attorney would not have brought plaintiffs' Count One claims because he could not have certified compliance with Rule 11(b)(1), (2), and (3).

narrower view of the law than other jurists of reason might have? As for the possibility that plaintiffs were advancing a "nonfrivolous argument" for a change in the law, we note that nowhere in the record—before the district court or this court—did plaintiffs contend that they presented their Count One claims in an effort to extend, modify, or reverse existing law or to establish new law, nor did the court advance that argument for them.

2.

When a district court's findings of fact and conclusions of law do little more than restate the elements of the applicable statute, we ordinarily vacate the decision and remand the case for further findings and conclusions. See, e.g., Tilton v. Playboy Entm't Group, Inc., 554 F.3d 1371, 1379 (11th Cir. 2009) ("Because the district court did not articulate the reasoning behind its decision to deny Tilton's request for attorney's fees, we remand to the district court to make appropriate factual findings or to provide a reason for declining to award attorney's fees."); Serra Chevrolet, Inc. v. Gen. Motors Corp., 446 F.3d 1137, 1152 (11th Cir. 2006) (remanding and instructing the district court to "provide a rationale" and a "record of its reasons" for any fine imposed as a sanction under Rule 37, sufficient to "afford meaningful review"). We use the word "ordinarily" because a remand is not necessary in all cases; in some cases, the record on appeal may be sufficiently

106

developed to enable us to adjudicate the merits of the appeal. Here, the merits turn on whether a reasonably competent attorney could have filed and prosecuted the Count One claims without violating Rule 11(b). If the record establishes conclusively that a reasonably competent attorney could have done so, our review would end there; the district court's decision denying sanctions could not have constituted an abuse of discretion. By the same token, if the record establishes conclusively that no reasonably competent attorney could have filed and prosecuted any of those claims, the district court's decision denying sanctions would have constituted an abuse of discretion.[151] In that case, we would reverse the district court's decision with respect to the claims a reasonably competent attorney could not have presented and remand the case for the imposition of sanctions. See Pelletier v. Zweifel, 921 F.2d 1465, 1514 n.87 (11th Cir. 1991) (concluding that a remand is unnecessary when the record "demonstrates beyond any question that Rule 11 sanctions are in order"). Still, a remand for "specific findings" would be in order as to the Rule 11 issues incapable of appellate review.

## D.

### 1.

---

[151] By conclusively, we mean that we can deduce from the record that any decision by a district court not to impose sanctions would constitute an abuse of discretion.

In assessing plaintiffs' attorneys' compliance with Rule 11(b), the district court failed explicitly to recognize that each of the five plaintiffs had sought relief against Peeples in Count One under three theories of liability, for violations of Rules 10b-5(a) and (b) and § 20(a). Count One therefore presented a total of fifteen claims. Instead of treating Count One as presenting fifteen separate claims, the district court bunched the fifteen claims together and considered them as a whole. This is precisely how plaintiffs' counsel drafted the complaint: counsel bunched the federal securities fraud claims together[152] with allegations that the Active Members, in failing to disclose their arrangements with Peeples, breached the fiduciary duties imposed on them by the Operating Agreement and conspired with Peeples to defraud plaintiffs.

The district court also failed to analyze the Count One claims under each of the subparts of Rule 11. As noted, the PSLRA requires the district court to "include in the record specific findings regarding compliance by each party and each attorney representing any party with <u>each requirement</u> of Rule 11(b) . . . ." 15 U.S.C. § 78u-4(c)(1) (emphasis added). Because the court is mandated to conduct this Rule 11 assessment, that a party has or has not moved the court to impose sanctions under the PSLRA, on the ground, for example, that opposing counsel

---

[152] <u>See</u> <u>supra</u> note 57 and accompanying text.

failed to comply with a certain subpart of Rule 11, is of no moment.[153]  In sum, in this case, the district court was obligated to consider each of Count One's fifteen securities claims—the Rules 10b-5(a) and (b) and § 20(a) claims for all five plaintiffs—for compliance with each subpart of Rule 11(b).

2.

Before we consider the merits of Peeples's challenge to the district court's sanctions decision, we recall briefly what Peeples allegedly did to render himself liable to plaintiffs under Rules 10b-5(a) and (b) and § 20(a) and why the district court granted him summary judgment.[154]

First, Peeples falsely stated that he was not involved in the Put and Call that the Active Members issued on February 25, 2002.  DynaVision's principals reasonably relied on these false statements[155] and, as a result, caused DynaVision to

---

[153]  The PSLRA gives the parties and counsel advance notice that, at the conclusion of the case, the court will determine whether the parties and their counsel complied with Rule 11's requirements.  See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 579 F.3d 143, 152 (2d Cir. 2009) ("By virtue of this statutory notice, consideration of sanctions in the PSLRA context can never be sua sponte and can never come as a surprise, because Congress, not the court, has prompted and mandated a Rule 11 finding.").

[154]  As noted in part II.B.1, supra, the federal securities law claims were presented initially in Count One and thereafter in Counts Two through Seven, each of those counts incorporating by reference all of the complaint's preceding allegations, including, of course, Count One.  For ease of discussion, we refer to this seven-count assertion of plaintiffs' federal securities law claims as Count One.

[155]  DynaVision's principals say that they also relied on Peeples's similar statement to Paul Walker after the February 8, 2002, Put and Call (which subsequently was aborted) issued.

sell its interest in Signature. This rendered Peeples liable to plaintiffs under Rule 10b-5(b).

Second, Peeples "directly or indirectly controlled the activities of the Active Members" in their management of Signature's affairs. This was evidenced by his January 21, 2002, letter of intent, the "secret discussions" he had with the Active Members prior to the issuance of the February 25 Put and Call, and the Asset Purchase Agreement he entered into with them after they acquired DynaVision's interest. He thereby became liable, as a "controlling person" under § 20(a) of the 1934 Act, for the false statement Brenda Smith made to Ledford and O'Dell on February 8 that the Active Members were "doing this on our own," a Rule 10b-5(b) violation, and for the Active Members' failure to disclose the January 21, 2002 letter of intent and Peeples's offer to purchase Signature.

Third, the Active Members, in violation of Rule 10b-5(a), engaged in a "scheme, device, and artifice to defraud" DynaVision. Smith made the we are "doing this on our own" statement pursuant to the scheme, and Peeples, as a participant in the scheme, became vicariously liable for her statement and for the Active Members' failure to disclose the January 21 letter of intent and Peeples's offer.

The district court denied the first claim based on Peeples's false statements

110

because the statements played no role in DynaVision's decision to sell.[156]  The court denied the second claim because DynaVision's principals did not rely on Smith's February 8 we are "doing this on our own" statement in electing to sell DynaVision's interest and because, as the Georgia Court of Appeals held in Ledford v. Smith, the Active Members had no duty to disclose their arrangement with Peeples.  The court denied the third claim without elucidation.

In their petition for rehearing, plaintiffs contend that their attorneys should not be sanctioned for joining co-plaintiffs with DynaVision as Count One plaintiffs because a fair reading of the complaint reveals that DynaVision brought that count alone.  Such a reading is reasonable, plaintiffs maintain, because DynaVision was the only plaintiff that owned a membership interest in Signature and therefore the only seller.  Plaintiffs note, moreover, that, in moving the district court for sanctions, Peeples did not argue that sanctions were appropriate because co-

---

[156]  As indicated in part II.B.6, supra, plaintiffs abandoned their appeal of the district court's disposition of the Count One claims for relief under § 20(a) and Rule 10b-5(a).  Nonetheless, since we are reviewing the district court's refusal to impose sanctions for plaintiffs' prosecution of those claims, we must determine whether plaintiffs' counsel satisfied Rule 11(b)'s requirements in presenting them.

111

plaintiffs lacked standing to sue under Rule 10b-5(a) and (b) and § 20(a).[157]  That is,

Peeples's counsel did not read Count One as having been brought by co-plaintiffs as

well as DynaVision; otherwise, counsel would have sought sanctions for having

done so.  The notion that co-plaintiffs did not join DynaVision in prosecuting the

Count One claims—that DynaVision is the sole Count One plaintiff—is, in our

view, untenable.  We say this for several reasons.

First, in drafting the complaint, plaintiffs' counsel named co-plaintiffs as

plaintiffs in every count.  They apparently did this to enable the court to entertain

co-plaintiffs' state law claims in Counts Two through Seven—in the exercise of its

pendent claim jurisdiction.[158]  Given the limitations of pendent claim jurisdiction,

co-plaintiffs could not prosecute their state law claims unless they joined

DynaVision in prosecuting the Count One federal securities law claims.[159]

---

[157]  In their petition for rehearing, plaintiffs state: "Count One is reasonably construed as limited to DynaVision, which sold its interest.  Count One refers to DynaVision 11 times, and any ambiguity as to which plaintiff asserts Count One is resolved by ¶¶ 90-92).  Tellingly, defendants did not move for sanctions on this basis."  (Citations omitted.)

[158]  Plaintiffs' counsel were apparently unaware of the fact the enactment of 28 U.S.C. § 1367 eliminated pendent claim jurisdiction and ancillary jurisdiction.  See supra note 89 .

[159]  As previously indicated, plaintiffs invoked 28 U.S.C. § 1331 and 15 U.S.C. § 78aa as the jurisdictional bases for their Count One federal securities law claims and the doctrines of pendent and ancillary jurisdiction as the jurisdictional bases for their Counts Two through Seven state law claims.  The doctrine of pendent jurisdiction enabled a federal district court to hear a

Second, until they filed their petition for rehearing, plaintiffs' submissions to the district court and this court belied the notion that co-plaintiffs were not Count One plaintiffs. Although Count One sought damages for DynaVision, the plural term "plaintiffs" was used to identify the parties to Count One, which alleged that "plaintiffs" relied on Peeples's and the Active Members' representations in causing DynaVision to sell its interest in Signature.[160] In Count Six, "[p]laintiffs" sought the recovery of "their" expenses, including attorney's fees, incurred in prosecuting

state law claim, over which it lacked jurisdiction, when joined with a related federal claim, over which it had jurisdiction, if the two claims arose out of the same event or connected series of events. See United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 116 L. Ed. 2d 218 (1966). Thus, if co-plaintiffs were joined with DynaVision in Count One, the court would have jurisdiction to entertain co-plaintiffs' claims in Counts Two through Seven to the extent that they arose out of the same event or series of events that gave rise to Count One's Rule 10b-5(a) and (b) and § 20(a) claims. The doctrine of ancillary jurisdiction was somewhat like pendent jurisdiction, but instead of supporting a plaintiff's state law claim that was pendent to a claim arising under federal law, the doctrine supported jurisdiction over claims interposed by parties other than the plaintiff. See Federman v. Empire Fire & Marine Ins. Co., 597 F.2d 798, 810 (2d Cir. 1979) ("[W]hen, subsequent to the filing of the complaint, a party other than the original plaintiff injects state claims into a controversy as counterclaims, cross-claims, or third-party claims, such claims fall within the court's ancillary jurisdiction rather than its pendent jurisdiction."). Given plaintiffs' counsel's objective—to provide the district court with a jurisdictional base for co-plaintiffs' state law claims—they should have invoked § 1367, not the doctrine of ancillary jurisdiction.

[160] For example, the following statements appear in Count One: "The Plaintiffs reincorporate herein by reference . . . ."; "The securities fraud described herein ultimately financially rewarded the Defendants, at the expense of the Plaintiffs . . . ."; and "These misrepresentations and failures to disclose by the Active Members were made with scienter and relied upon by the Plaintiffs to their detriment."

113

Count One, as well as Counts Two through Five; in Count Seven, "[p]laintiffs" sought punitive damages in Counts One through Five on the ground that Peeples's "conduct" "was willful, wanton and . . . would raise a presumption of conscious indifference to consequences."

Third, Peeples's counsel, in prosecuting Peeples's motion to dismiss and motion for summary judgment, and the district court, in denying the motion to dismiss and granting the motion for summary judgment, treated all plaintiffs as prosecuting Count One. The statement that "Plaintiffs have alleged that the Defendants are primary violators of two subsections of 10b-5" appears in plaintiffs' responses to both of Peeples's motions (emphasis added).[161]

Fourth, in their opening brief on appeal, plaintiffs frame the federal securities law issues as applying to and being appealed by multiple "plaintiffs."

Having establish that co-plaintiffs were parties to the federal securities claims, we proceed to address the merits of these claims. To prevail on Count One, co-plaintiffs had to prove that they were sellers of a security—DynaVision's

---

[161] Similarly, the district court, in granting Peeples' motion for summary judgment, consistently referred to the securities claims as "[p]laintiff's Rule 10b-5 claim" and "[p]laintiffs' control person liability claim."

membership interest in Signature—as required by Blue Chip Stamps.[162] They could not prove that. It is therefore beyond doubt that a reasonably competent attorney could not have certified that co-plaintiffs' Count One claims satisfied the Rule 11(b)(2) and (3) requirements. We therefore reverse the district court's decision to the extent that it failed to sanction plaintiffs' counsel for prosecuting Count One on co-plaintiffs' behalf and remand the case for the imposition of sanctions pursuant to the PSLRA, 15 U.S.C. § 78u-4(c)(2).

3.

We turn now to DynaVision's claims, beginning with its Rule 10b-5(b) claim. The district court found, and we have agreed, that, as a matter of law, DynaVision's Rule 10b-5(b) claim failed because Peeples's denial of involvement in the Put and Call played no role in DynaVision's decision to forego the purchase of the Active Members's interest. The district court nonetheless found that sanctions were not warranted because "evidence in the record also permitted Plaintiffs and their counsel to present reasonable, good faith arguments that

---

[162] See Part III, supra.

115

Plaintiffs acted as they did based on Defendants' conduct."[163]  As we have observed, the district court did not identify that evidence.  Hence, we cannot know whether the facts the evidence yielded could have "permitted . . . counsel to present reasonable, good faith arguments" for asserting the Count One claims.  We therefore vacate the district court's sanctions decision with instructions that the district court identify the evidence it was referring to and explain how that evidence justified the plaintiffs' counsel's filing of DynaVision's Count One claims.  In doing so, the court is limited to the evidence as it existed at the time it denied sanctions, examining the information plaintiffs' counsel were privy to at the time they filed the complaint.[164]

4.

We next address DynaVision's § 20(a) claim—that Peeples, as a control

---

[163]  The district court erred in utilizing the "good faith" standard in assessing Rule 11(b) compliance.  As indicated in note 143, supra, the good faith standard was abolished with the 1983 amendment to Rule 11.

[164]  This information would of course include the information plaintiffs provided counsel prior to the filing of Ledford v. Smith in the Murray County Superior Court and the information disclosed during the prosecution of that case, including that furnished on deposition by Paul Walker, Ledford, and O'Dell.

    If the district court is satisfied that a Rule 11(b) violation did not occur with the filing of the complaint, it must consider whether, in light of the information plaintiffs' counsel subsequently acquired, they should have abandoned any of the Count One claims.

person of the Active Members, was liable for the Active Members' violation of the 1934 Act. In order to succeed on this claim, DynaVision had to prove both that the Active Members violated the 1934 Act and that Peeples controlled the Active Members in committing the violation. DynaVision asserted two underlying violations of Rule 10b-5(b) by the Active Members for which Peeples was derivatively liable: first, the Active Members' failure to disclose the contents of the January 21 letter and Peeples's offer, and second, Smith's misrepresentation that they were "doing this on our own."

We have no difficulty in concluding that the Active Members did not commit an underlying securities law violation; however, the district court must consider on remand whether a reasonably competent attorney could have made that claim.[165]

---

[165] Smith's "doing this on our own" statement was not actionable under Rule 10b-5(b) because it had nothing to do with DynaVision's decision to sell its interest in Signature rather than purchase the Active Members' interests. Absent Smith's primary liability under Rule 10b-5(b), Peeples could not be held secondarily liable under § 20(a). Likewise, the Active Members did not have a duty to disclose the January 21 letter and Peeples's "offer." Such a disclosure is not required by Rule 10b-5. In Ledford v. Smith, the Georgia Court of Appeals rejected the argument that the Limited Liability Act and/or the Operating Agreement required the Active Members, as fiduciaries, to disclose their pre–Put and Call negotiations or understandings with Peeples. 618 S.E. 2d at 635–36. Moreover, § 9.2 of the Operating Agreement, entitled "Right of First Refusal," made clear that the Active Members could negotiate with Peeples in secret. Section 9.2 gave a Member the right to receive a "bona fide offer" from a third party to purchase the Member's interest without informing the other Members of the offer. If a Member had the right to receive an offer, it also had the right to solicit an offer and, in doing so, to negotiate with the third party in secret. The Member's duty to inform the other Members of an offer would not

Likewise, we have no difficulty concluding that Peeples was not a controlling

person under § 20(a).

> In this circuit, a defendant is liable as a controlling person under
> section 20(a) if he or she "had the power to control the general affairs
> of the entity primarily liable at the time the entity violated the
> securities laws . . . [and] had the requisite power to directly or
> indirectly control or influence the specific corporate policy which
> resulted in the primary liability."

Brown v. Enstar Group, 84 F.3d 393, 396 (11th Cir. 1996) (quoting Brown v.

Mendel, 864 F. Supp. 1138, 1145 (M.D. Ala. 1994)).[166]  In the situation at hand, "at

the time the entity violated the securities laws" refers to February 8, 2002, when

Smith uttered the we are "doing this on our own" statement.  The "entity primarily

liable" refers to Smith and, because she allegedly spoke for Thomas and Ownbey,

the Active Members.

DynaVision posited that the following pieces of evidence established that

Peeples controlled the Active Members' behavior in managing Signature and in

---

arise unless and until the Member "desire[d]" to accept the offer, at which point the Member
would have to notify the other Members of the offer.

[166]  To state a § 20(a) claim, the plaintiff must establish that the defendant "had the power to
control the general business affairs" of the controlled person, and "'had the requisite power to
directly or indirectly control or influence the specific corporate policy which resulted in the
primary liability'" of the controlled person.  Theoharous v. Fong, 256 F.3d 1219, 1227 (11th Cir.
2001) (quoting Brown v. Enstar Group, 84 F.3d 393, 396 (11th Cir. 1996)).

dealing with DynaVision:  (1) the January 21 letter of intent; (2) the "secret discussions" with the Active Members in January and February of that year; and (3) the Asset Purchase Agreement made after the Active Members acquired DynaVision's interest.  While we have no difficulty concluding that none of this evidence established control,[167] the district court, on remand, must nonetheless consider whether a reasonably competent attorney could have brought a federal securities claim relying on this evidence to prove control.

5.

Having concluded our analysis of the § 20(a) claim, we turn to the claim DynaVision brought under Rule 10b-5(a).  Rule 10b-5(a) proscribes a "device,

---

[167]  The Asset Purchase Agreement was circumstantial proof of the non-binding discussions Peeples had with the Active Members before they issued the Put and Call, but it did not make him a controlling person at the time the Active Members committed the acts that allegedly rendered them primarily liable under Rule 10b-5.  Neither did the secret discussions.  The problem with relying on the January 21 letter of intent is the caveat appearing at the end of the letter: "to the extent of any conflict in the provisions of this Letter and the provisions of the Signature Operating Agreement, the provisions of the Signature Operating Agreement shall prevail and the conflicting provision(s) of this Letter shall be void and of no effect whatsoever." Peeples's lawyers drafted this language.  They had read the Operating Agreement and were especially sensitive to its provisions.  They were particularly attuned to the affirmative obligations that the Agreement imposed on the Active Members and the extent to which it restricted their activity—for example, to the prohibition on the Active Members pledging their interests in Signature as collateral for a loan.  The caveat served to ensure that nothing Peeples had written, or that the parties had discussed, could be considered as interfering with the Active Members' obligations to Signature and its Members.  Peeples's lawyers wanted to avoid exposing their client, and the Active Members as well, to litigation.

scheme, or artifice to defraud." To recover under this rule, the plaintiff must show not only that the defendant concocted a plan to defraud, but that the plan was successful—that is, that the defendant, acting with scienter, misrepresented a material fact on which the plaintiff relied to his detriment.[168] See Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001). The misrepresentations DynaVision relied on to establish this claim were those Peeples and Smith made. They were not actionable because DynaVision did not rely on them in electing not to purchase the Active Members' interest. DynaVision's Rule 10b-5(a) claim had no foundation in the evidence. The district court rejected the claim without discussion, because none was required. The court now must go one step further and examine whether counsel ignored Rule 11's admonitions in bringing it.

## E.

We now consider whether the district court should have sanctioned plaintiffs as well as their attorneys. A plaintiff is subject to monetary sanctions if the plaintiff misrepresented the facts alleged in the complaint. See Byrne v. Nezhat, 261 F.3d

---

[168] See supra part IV.A.

120

1075, 1117-18 (11th Cir. 2001).[169]  In this case, we assume that what the individual plaintiffs and Paul Walker told plaintiffs' counsel prior to filing suit was essentially what they stated on deposition in state court and repeated on deposition in the district court, to-wit:  DynaVision chose to sell its interest because it would have "made no sense" and been "foolish" to elect the Put and Call option and purchase the Active Members' interests.[170]  These were straightforward, damaging admissions.  The decision of these laymen to file suit and to continue on to the end was made on the advice of counsel.  That said, we find no basis for imposing monetary sanctions on plaintiffs.

## VII.

For the reasons set out herein, we AFFIRM the district court's judgment granting defendants' motion for summary judgment.  We AFFIRM the district court's sanctions order to the extent that it denies PSLRA sanctions against plaintiffs.  We VACATE the sanctions order regarding the imposition of sanctions

---

[169]  As indicated in note 139, supra, under the version of Rule 11 in effect at the time the district court made its sanctions rulings, monetary sanctions could not be awarded against a represented party for a violation of Rule 11(b)(2).

[170]  See supra notes 31, 103, 104 and accompanying text.

against plaintiffs' attorneys, however, and REMAND the case with the following instructions: (1) the court shall impose sanctions against plaintiffs' attorneys for filing and prosecuting the Count One claims on behalf of co-plaintiffs;[171] and (2) the court shall determine whether plaintiffs' attorneys should be sanctioned for filing and prosecuting the Count One Rule 10b-5(a) and (b) and 20(a) claims on behalf of DynaVision in accordance with part VI of this opinion.

SO ORDERED.

---

[171] The court must determine, in accordance with note 142, supra, whether H. Greely Joiner, LLC should be sanctioned.

EDMONDSON, Circuit Judge, concurring in the result in part and dissenting in part.

I would grant the Petition for Rehearing to the degree it deals with sanctions. I would affirm the whole judgment, including the denial of sanctions.